ELIZABETH W. GARDINER, *Appellant,* v. FRANCIS GOERTNER, *Appellee.*

149 So. 186.
Opinion filed July 18, 1932.
Opinion on Re-hearing filed June 5, 1933.
Opinion on Petition for Re-hearing filed June 27, 1933.

378

*Mitchell D. Price, Zaring Youmans,* and *Florence* and *E. F. P. Brigham,* Attorneys for Appellant;

*McElya & Robinson,* Attorneys for Appellee.

DAVIS, Commissioner.—This case is here upon appeal from a decree of the Circuit Court of Dade County affirming an order and judgment of the County Judge's Court of said county, finding and adjudging that an instrument theretofore admitted to probate as the last will and testament of Francis Gardiner, deceased, was not in fact the last will and testament of the said Francis Gardiner, and revoking the probate thereof.

The proceeding was instituted under and by virtue of Section 5476 (3611), Compiled General Laws of Florida, 1927. Though not admitting that the contested instrument was signed by Francis Gardiner, the petitioner, who represents himself to be the son of the deceased, in seeking the relief prayed for, relies chiefly upon allegations showing testamentary incapacity and undue influence brought to bear upon testator to induce him to execute the instrument.

In the order of the County Judge revoking the probate

of the will, it does not appear upon what ground, or grounds, he based his conclusion that the instrument in question was not the last will and testament of the said Francis Gardiner. A statement of the evidence in the case, would consume much space and no great benefit would be derived therefrom. Suffice it to say that it was shown that testator's name was Goertner and that he had it changed during the war to Gardiner; that in early life he entered into relations with the mother of appellee that would probably constitute a common law marriage and that such relations continued until about six months before the birth of appellee, when a ceremonial marriage was performed; that they then lived together the greater part of the time until 1901; that thereafter Gardiner did not see his wife or son, but kept in touch with his wife, who was a public school teacher in the City of New York, until about the time of his death, but for some time he contributed small sums to her at various times during the minority of his son. During the years, after the separation, the appellee believed his father was dead. Prior to Gardiner's separation from the mother of the appellee, Gardiner became intimate with other women, and from that time until his death he lived openly, from time to time, with different ones. Some of them while living with him were known to his friends and acquaintances as his wife. In 1901, he went through the usual ceremony of a legal marriage with one of them, and with this woman, he lived until 1919 and thereafter he communicated with her until a short time prior to his death. In 1928, as a result of the proceedings instituted in Dade County, a decree was rendered dissolving this alleged marriage. This divorce proceeding has been criticized here and the Court cannot say that it is free from the suspicion that a fraud was perpetrated upon the Court. The next day after the granting of said decree, November 28,

1928, Gardiner and the appellant, in pursuance of an agreement previously entered into between them, were the principal figures in a marriage ceremony which was performed in Dade County and thereafter they lived together as husband and wife until Gardiner's death in November, 1929. There is no evidence before the Court to show that Gardiner had ever been divorced from his first wife, the mother of the appellee. It was stated by her (the first wife) upon the witness stand, that no divorce had ever been obtained, so far as she knew. On and after November 24, 1922, Gardiner executed as many as five wills and as many codicils to his wills. To a will executed on November 24, 1922, was attached five codicils bearing different dates. Four of the wills were executed from September 23, 1927, to November 1, 1929, both inclusive.

Testimony was adduced to show the physical condition of the testator, and that for a number of years he had been treated for Bright's disease, diabetes, arterio schlerosis and that in early manhood he had contracted syphilis, which possibly was never cured; that from time to time during his last years he was in hospitals for treatment, and medical testimony was produced to show what effect, if any, these diseases would have upon the mind. A number of friends and persons with whom Gardiner had business dealings, and medical men, all of whom had more or less opportunity to observe his demeanor for some time before his death, were produced for the purpose of showing his mental condition before, about the time of, and subsequent to, the execution of the will in question. A number of checks signed by the testator about the time of the execution of the will, other instruments that were shown to have been executed, as well as an array of his written criticism of books recently read by him, were received in evidence. The witnesses who had seen him and testified as to his mental

condition—laymen, doctors, nurse and witnesses to the will —were of the opinion that testator was mentally capable of making a will, or that he had appeared to be the same as he had always been, so far as his mentality was concerned, and the unrefuted testimony discloses that he had an extraordinary if not a brilliant mind. One specialist in mental diseases, who had not seen Gardiner, basing his opinion on the history of testator's physical ailments, as shown in evidence, his business transactions and conversations with friends, as shown in evidence, together with the specimens of his signature, which indicated what was termed evidence of a dilapidated personality, which accompanies dementia, stated without qualification that testator was suffering with a dementia, accompanying an organic state of the brain and was mentally incapacitated to make a rational disposition of his property at the time the instrument was signed by him. Another specialist in mental troubles, just as credible as the one just referred to, in response to a hypothetical question, stated that he could "see no sign of mental derangement from the description you have just given of the man's activities."

A question of practice has been raised by appellant over the admission of certain testimony offered by appellee, but entertaining the views that we do, as to the mental competency of testator at the time of execution of the will of November 1, 1929, this question becomes of no importance in this case.

The probate of wills so far as concerns any personal estate shall be conclusive as to the validity of the will of which it is the probate, and the probate of wills so far as it concerns real property shall be prima facie evidence of the validity of wills of which it is the probate, in any suit or controversy in relation to or concerning the property

thereby devised or bequeathed. Section 5475, Compiled General Laws, 1927.

Any person interested may make application to the Court * * * for a revocation of such probate, * * * and the said court shall, upon the petition and answer of the parties, and the proof adduced by them * * * confirm or revoke the said probate according to the law and justice of the case. Section 5476, Compiled General Laws, 1927.

It is settled here that in a proceeding of this character a testator at the time of making a will is presumed to be sane and that "the burden of rebutting this presumption and establishing incompetency to make a will or proving undue influence so operating upon" him as to destroy the free agency of testator rested upon petitioner. Schaefer v. Voyle, 88 Fla. 170, 102 So. 7. See also Barry v. Walker, 103 Fla. 533, 137 So. 711.

The same principle is stated in Travis v. Travis, 81 Fla. 209, 87 So. 762, and in 28 R. C. L. 398-9, we find it stated that the weight of authority "is to the effect that in a contest of a will which has heretofore been duly admitted to probate the burden of proof is on the contestant to establish his grounds of contest. The probate is held to be *prima facie* evidence of the due attestation, execution and validity of the will and the burden is upon the contestants to overthrow the will." See also, Estate of Hayes, 55 Cal. 340, 135 Pac. 449, Ann. Cas. 1914 C. 531 and note; Scott v. Thrall, 77 Kan. 688, 95 Pac. 563, 127 A. S. R. 449, 17 L. R. A. (N. S.) 184; In re: Murphy's Estate, 43 Mont. 355, Ann. Cas. 1912, C. 380, 116 Pac. 1004; Steinkuehler v. Wempner, 169 Ind. 154, 81 N. E. 482, 15 L. R. A. (N. S.) 673; Note 67 A. L. R. 383.

We are mindful of the rule that if there is evidence to support the Court's finding, and it does not clearly appear to be erroneous, it will not be disturbed. Schaefer-Voyle,

*supra,* and other cases therein cited. In the Schaefer-Voyle case this principle was applied in a proceeding like the one at bar. Where, however, the probate judge misapprehends the legal effect of the evidence as an entirety, his findings should not be sustained on appeal, because there is evidence on which findings may be predicated. Hamilton v. Morgan, 93 Fla. 311, 112 So. 80; Mulford v. C. F. Trust Co., 99 Fla. 600, 126 So. 762.

A court should not set aside a will, deed or other agreement for mere mental weakness if it does not amount to inability to comprehend the effect and nature of the transaction and is unaccompanied by evidence of imposition or undue influence. Douglas v. Ogle, 80 Fla. 42, 85 So. 243; Travis v. Travis, *supra;* Clarke v. Hartt, 56 Fla. 775, 47 So. 819; Waterman v. Higgins, 28 Fla. 660, 10 So. 97.

If testator was of "sound mind," in the sense that the term is used in the statute, he had the power to dispose of his property by will (Section 5457 [3592], Compiled General Laws of Florida, 1927), and unless it should clearly appear that he was induced to execute the will by fraud, undue influence or other unlawful means, it should be upheld. Hamilton v. Morgan, *supra;* Newman v. Smith, 77 Fla. 633, 667, 668, 82 So. 236; Sweetser v. Ladd, 52 Fla. 663, 41 So. 705.

"A 'sound mind,' as applied to the execution of a will, comprehends ability of the testator to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed. The free use and exercise of a 'sound mind' in making a will may be prevented in many ways; but if a testator has a 'sound mind' when he makes

his will, its free use and exercise will be assumed until the contrary clearly appears." Hamilton v. Morgan, *supra*.

"The rule seems to be well settled that undue influence justifying the setting aside of will, deed, or other contract must be such as to dethrone the free agency of the person making it and rendering his act the product of the will of another instead of his own. The character of the transaction, the mental condition of the person whose act is in question, and the relationship of the parties concerned to each other, are all elements that may be taken into consideration in applying the rule." Peacock. v. DuBois, 90 Fla. 162, 105 So. 321. While it follows from this doctrine (and it has been so held), that "an attack on a will on the ground of undue influence concedes the existence of testamentary capacity," (Hamilton v. Morgan, *supra;* 28 R. C. L. 139; 1 Woerner, Am. Law of Admin. 3rd Ed. 61; 29 Am. & Eng. Enc. Law 104), it is always proper to inquire into the mental and physical condition of a testator at the time of the execution of his will. "What degree of influence will vitiate a will depends much upon the bodily and mental vigor of the testator, for that which would overwhelm a mind weakened by sickness, dissipation, or age might prove no influence at all to one of strong mind in the vigor of life." I Woerner, American Law of Administration, 3rd Ed. 60; 28 R. C. L. 139.

It has been said that no subject affords greater scope to juries for the indulgence of personal opinions and views of right and wrong, because no general rule can be laid down to ascertain the extent and nature of the influence under which a testator may have acted, or, where this is ascertained to determine whether and to what extent such influence was legitimate or unlawful. 1 Woerner, Am. Law of Admin. 3rd Ed. 57.

Undue influence is not usually exercised openly in the

presence of others, so that it may be directly proved, hence it may be proved by indirect evidence of facts and circumstances from which it may be inferred. 28 R. C. L. 142-3; 1 Woerner Am. Law of Admin. 3rd Ed. 61; 40 Cyc. 1164; 29 Am. & Eng. Enc. Law, 2nd Ed. 111. No one of such facts or circumstances, when considered alone, may be of much weight but when combined with other facts may be sufficient to establish the issue. 40 Cyc. 1166-1190.

Mere opportunity to exercise influence over a testator does not, even in connection with an unjust will, warrant the presumption of undue influence, in the absence of affirmative evidence of its exercise, where the testator's *mind is unimpaired* and he understands the contents of his will, (1 Woerner, Am. Law of Admin., 3rd Ed. 60; Newman v. Smith, *supra*. See Annotation 66 A. L. R. 254.), yet it is a circumstance that may be considered. 29 Am. & Eng. Enc. Law, 2nd Ed. 113.

In Elliott v. Fiske, 162 Wis. 249, 155 N. W. 110, it is said:

"While it is true that a testator susceptible to undue influence, an opportunity for the exercise thereof, a disposition to exercise it, and a result indicating its exercise must be established by clear and satisfactory evidence before a Court is justified in setting aside a will, yet the clear establishment of three of these essential elements may, with slight additional evidence as set forth compel the inference of its exercise."

The unnatural character of a will does not of itself prove undue influence (Woerner, Am. Law of Admin., 3rd Ed. 62), yet when that is supplemented by other suspicious circumstances, it may throw onus upon the favored beneficiary. Newman v. Smith, 77 Fla. 633, 677, 688, 82 So. 236; 1 Woerner, Am. Law of Admin. 3rd Ed. 62.

Influence which exists from affection or desire to gratify

is not undue influence sufficient to invalidate a will. Newman v. Smith, *supra.*

No presumption of undue influence is raised from the fact that benefits were obtained by acts of kindness or persuasion toward testator by beneficiary. Note 66 A. L. R. 250; I Woerner, Am. Law of Admin. 3rd Ed. See 59. If, however, his mind was impaired, though not to the extent of making him mentally incapable of making a will, and his physical condition was such that he did not have strength of will enough to resist the influence brought to bear upon him, solicitations in connection with other circumstances may be sufficient to destroy the free agency of the testator and control the disposition of his property under the will, and thereby destroy the validity of the will (28 R. C. L. 138; 40 Cyc. 1147), and this is true even when the influence over the testator is exerted by his wife. 40 Cyc. 1148; 29 Am. & Eng. Enc. Law, 2nd Ed. 130.

"Undue influence to affect an act of a person must have been exercised with reference to that particular act and notes to other acts. But the circumstance that other acts were the result of undue influence may be material as evidence that the particular act was also the result of such influence." 29 Am. & Eng. Enc. Law 107.

Undoubtedly a testator possessed of mental capacity may make an unreasonable and unjust will and may even disinherit his children (Hamilton v. Morgan, *supra;* Newman v. Smith, *supra;* 28 R. C. L. 90; Applehans v. Jurgenson, 336 Ill. 427; 168 N. E. 327; 67 A. L. R. 851), but there is always a presumption against disinheritance (28 R. C. L. 81). "Apparent inequality or unreasonableness in a testamentary disposition is entitled, in proportion to its degree of flagrancy, to some auxiliary influence on the question of capacity or fraud or controlling influence; and unexplained and combined with other corroborating evidence, it may be

entitled to great influence." Newman v. Smith, *supra*. See Annotation 66 A. L. R. 250; I Woerner, Am. Law of Admin. 3rd Ed. 62.

In the Newman-Smith case, this Court said: "That an entire change from former testamentary intentions is a strong circumstance to support a claim of undue influence is well supported by the authorities."

The physical and mental conditions of testator, his susceptibility to influence, his age, circumstances attending the execution of the will are subjects of consideration and may become important in determining whether undue influence was exerted. 40 Cyc. 1156, 1161. It is even proper to consider the interest or motive on the part of a beneficiary to unduly influence a testator, and facts and surroundings giving them an opportunity to exercise such influence. 40 Cyc. 1162.

In 29 Am. & Eng. Enc. Law, 2nd Ed. 114, the authors say that "the circumstance that the will was drawn by or under the direction of a beneficiary, or of one whose family are beneficiaries, while not in itself sufficient to invalidate a will or even to give rise to any presumption of undue influence, is nevertheless of such a character as generally to excite the Court to suspicious scrutiny, the suspicion being greater or less in proportion to other circumstances such as interest taken, or the relation existing between testator and beneficiary." (See also Annotation 28 L. R. A. [N. S.] 270, 281.) This statement is sustained by many authorities. On the other hand, there are also a great number of cases in which it was held, where one who draws a will is benefitted thereby, generally a presumption is raised that the will was procured by undue influence, and this is especially so when the one drawing the will stands in a confidential relation to the testator. See cited cases in note 66 A. L. R. 244.

In equity, as at law, every presumption is in favor of the correctness of the ruling of the trial court and a decree based largely or solely on questions of fact will not be disturbed unless clearly erroneous. Peacock v. DuBois, 90 Fla. 162, 105 So. 321; McMillan v. Warren, 59 Fla. 578, 52 So. 825; Millinor v. Thornhill, 63 Fla. 531, 58 So. 34; Harp v. McRae, 100 Fla. 141, 129 So. 499.

The burden is on appellant to show that the finding and order of the probate judge and the decree affirming same were clearly erroneous. Wang v. First Nat'l. Bk. 92 Fla. 974, 110 So. 527; Rundel v. Gordon, 92 Fla. 1110, 111 So. 386; Stevens v. Tampa E. Co., 81 Fla. 512, 88 So. 303; Wood-Hoskins-Young Co. v. Taylor Development Co., 98 Fla. 156, 122 So. 224; Howard v. Goodspeed, 101 Fla. 699, 135 So. 294; Foxworth v. Maddox, 137 So. 161; 136 So. 343; 136 So. 506.

In the light of the foregoing, it devolves upon us to determine whether it clearly appears from the facts adduced in evidence that the decree of the Circuit Court affirming the finding and order of the Probate Judge is erroneous. The evidence before the county judge tends to show that the testator was a man about 59 years old at the time of his death; that he had a predilection for women; that he had been treated for Bright's disease, diabetes, arterio sclerosis and other troubles for a number of years, and that one of his toes had given him a great deal of trouble for several years before his death, due, doubtless, to his diabetic condition; that for some years before his death he was at times on a diet, during which times his condition would improve, and that he used saccharine instead of sugar; that about the middle of September, 1929, he entered a hospital in Miami and had his bad toe amputated and returned home after having been in the hospital five or six days. From that time until his death he was under the care of a physician.

On occasions he would sit on the porch, and it may be on one or two occasions went for a short ride; but the greater part of the time he was in bed. The latter part of October he was suffering excruciating agony because of his foot, which was rather disturbing to his attending physician inasmuch as he had not been able to alleviate the pain. Tablets of luminal were left with the patient to be taken to make him sleep. On October 30th, his physician and a consulting physician, found him in a drowsy condition which they attributed to his taking too many of the tablets. The terrible pain in his foot continued, according to the statement of his physician, for a week after October 30th, but it was greatly relieved after his foot had been elevated on a pillow for some days. His physician, though knowing he was "skating on thin ice,' did not believe he was in a moribund or dying condition until about two days before his death. Until two or three days before his death, when a trained nurse was called in, the appellant did the nursing, being relieved at times by Thompson, her father-in-law. Gardiner's relations with appellant were termed by some witnesses as affectionate. Several times during his last illness, he discussed with his physician, Dr. Thomas, plans for building a new house, and the doctor says: "Each time would bring up about he was satisfied with his little house, if he had time to get up and waterproof it, and so forth; but he had promised his wife to build her that home and if he could get on his feet he could build it much more reasonable, but he would go through with it. At the same time he preferred not." His friend, E. O. Salman, testified that towards the end of July, 1929, or early part of August, while Gardiner, appellant and appellant's daughter were on a visit in the North, Gardiner, to quote witness' language, "complained to me of lack of feeling and interest, the same as I had noticed when at my home (end of July).

He also made expression to the fact that he was being nagged and talked into doing things and making expenditures which he did not feel he could afford, in particular he mentioned the buying of a house and the furnishing of same in Miami, which was evidently under construction; he could not afford such expenditures, and that on some occasions he mentioned that he got very little sleep during the previous night as he was continually arguing back and forth with Elizabeth, by whom he evidently meant his wife, Mrs. Elizabeth W. Gardiner." However, in one of his letters to his friend Salman, dated October 5th, 1929, he said, "We are going to put in the winter building a new home I have had on the program for the past three years." One of the conversations with Dr. Thomas about the house, took place on the day the will was executed and while the doctor was in the room the testator told appellant to call "a lawyer," and when the doctor left the house, the lawyer, Mr. Zaring, was there. Zaring testified that he went in and testator was sitting up in bed, smoking, and "after some general conversation he said he wanted to make a will; that he had dictated a memorandum; and he said that he made a previous will, just after he had been married to Mrs. Gardiner—'Elizabeth,' as he called her—that had made provision for Elizabeth, but that he had been thinking the matter over and had decided to give her everything. He said that he had knocked about the world a good deal, and had had experience with men and women, but that he didn't think there was a soul in the world that had any genuine affection for him, or any claim upon him, except Elizabeth. He said that he had made previous wills before he was married, and had scattered his property around without caring much where it went. But he said things were now different. That Elizabeth had, as he used the expression, 'been a brick' through his sickness; that she had made

him the only real home he had ever had. 'And furthermore,' he said, 'I have lost considerable money in Miami, in investments, and paid out a lot of money,' and that his capital had been whittled down. He said, 'I have, in this deflation that has been going on in the stock market'—he said, 'my securities are worth less by fifty thousand than they were. So that altogether, I don't think there is any more than enough to keep Elizabeth and Eleanor comfortable. So I have put everything—given everything to them.' I think he had in his hand, or it was lying on the bed—well, I have the original there, attached to the files;—he told me that he had dictated that to Elizabeth, and wanted me to read it over. Well, I read it, and I said, 'So you are a lawyer. That's one of your accomplishments, is it?' He says, 'Not guilty.' He says 'I have been everything but that.' And I complimented him on his legal phraseology. 'Well,' he said, 'any man that had as much business experience as he had, ought to write up a decent instrument.' * * * I asked him, I think, if he wanted a bond, and he said 'no.' He said, 'She gets everything anyway. Make it just as simple as you can.' I took the paper; I came back to the office."

The paper that witness referred to was unsigned, but in the form of a will, giving all of his property to appellant. That afternoon the will was executed in the presence of appellant and the same was attested by Zaring, Mrs. Zaring and a Mrs. Humphrys. Under the will all of testator's property was left to appellant.

The testimony shows that appellant was a divorcee and the daughter-in-law of "Commodore" (Walter) Thompson and had a daughter about seventeen years of age; that they were supported in part by her father-in-law who was somewhat instrumental in bringing Gardner and appellant together. It is in evidence that Commodore Thompson, testator and one J. T. Butts, with whom testator was on friendly

terms, were on a fishing trip with Gardiner not so long before Gardiner's marriage to appellant and while the three of them were engaged in a conversation,, Gardiner stated, as testified to by Buttes, " 'Well, I will tell you; I am getting so old, I haven't any business living around the house by myself.' And he says, 'I have been talking to Elizabeth about it, 'but I did not know who he was talking about. I don't know to this day, except that it later developed. And he says, 'I have told Elizabeth, and she understands that if we marry, there can't be any love and affection.' He says, 'If I take care of her, and provide her a good home,' he said, 'I think she understands all of that.' And Mr. Thompson said, 'Well, yes,' he says: 'Elizabeth deserves a lot of credit. She is a good woman. She has raised her daughter—she needs help. And I think she understands everything, Frank."

It developed that "Elizabeth" was Thompson's daughter-in-law, the appellant here. This statement of Butts was denied by Thompson.

Dr. Agos, called by appellee as a specialist on mental diseases, on cross-examination, being shown specimens of testator's signature from 1924 to November 1929, all of which were in evidence, said 'there is something that has caused the man to lose his efficient manual dexterity. Now what it is, mental or physical, I don't pretend to say; but I can see that they are different." Dr. Benton, a specialist called by appellee, went further and gave it as his opinion that the testator was not mentally capable of making a will, at the time the will of November 1st, 1929, was executed.

R. N. Humphreys, a friend of Gardiner's, testified that appellant, a week or ten days after testator's death, manifested anxiety over the failure to have the will probated, and said that there was a complication that possibly he (Humphreys) did not know about, and that she then told

him that Gardiner had a son. In a letter from appellant to "My dear Ben" (Newton) dated January 3, 1929, in which she refers to appellee as being in Miami, appellant said among other things, "Frank (Gardiner) told me that he had a divorce from this woman (appellee's mother), that she roped him in at the age of nineteen and married him and he later obtained a divorce, but I believed that he had done so, and I did not ask him where, and there are no records among his papers to show where it was obtained.

In letters to his friend Salman during the summer and fall of 1929, he refers more than once to his physical condition, and in a letter dated September 7, 1929, he said in part: "Sorry to say that I will not be able to get in my trip to France this year. It turns out that the trouble in my foot is that the bone in one toe (one of those affected in 1926) is diseased and that an operation will be necessary. Like all operations (before they are performed) this one is to be a mere trifle, only a couple of days in the hospital and quick convalescence, etc. I am quite prepared, however, to have something totally unexpected happen—some development unique in the doctor's experience and so on—and the doctors will be very sorry and there you are. However, it is certainly necessary that something be done, so I'm going through with it, but in my condition a complete lack of confidence in medical or any other experts, I don't like the job. In any case I will not be through with it in time to go to Europe so I will have to resign myself."

While there is nothing in the transcript to indicate that Gardiner manifested or entertained any affection for his son, since the latter was a very small boy, it does appear, at least, that he must have regarded him with respect and that he did not want the son to know of the profligate life that he had led. For instance, the witness Butts, testified that Gardiner had told him that he had a boy without naming him, and

that he, Gardiner, had said that the boy had been educated and graduated from law school and made a name for himself, and he, Gardiner, had been such a "damn roustabout" that he wouldn't do anything to reflect on his character or hurt his career. In a letter, dated March 30, 1928, received by the mother of appellee, identified as having been written on the typewriter of Gardiner and bearing earmarks which taken in connection with other testimony indubitably point to Gardiner as the author, and to the person therein referred to as "F" as being none other than appellee, we find the following passage:

"With the exception of a couple of trfling legacies to friends, my will provides that all the estate which 1 may possess when I die goes to yourself and F. and his heirs. A certain party gets the use for life of a small house that I own, also a small trust fund for life, both these reverting to F. at the death of this party. So that, eventually, anything that I have will go to F. and his heirs. Have also designated him as one of the executors and trustees and have given full instructions how to locate you, etc. Of course, when I die, F. will learn the facts, but all the facts he will learn will be that he and yourself are the heirs under the will of a party of my name. If he learns any more than this he will learn it from you. You can give him any explanation you like without fear of contradiction. This may seem incredible but is strictly true. I have kept my mouth shut religiously. So none of his illusions need be shattered."

In the several wills offered in evidence, with the exception of the one dated November 1, 1929, testator recognized the natural right of his son to participate in his estate, and also a moral, if not a legal obligation, due the mother of appellee.

In his will of November 24, 1922, after making certain other specific bequests, he bequeathed "to my son, Francis

Goertner the sum of $10,000.00,'' and all the rest and residue and remainder of his property he devised and bequeathed "to my former wife, Rose L. Goertner, her heirs," etc., but in the event she preceded him, then said residuary estate "to my son, Francis Goertner." Francis Goertner was named in this will as co-executor.

In the will dated September 23, 1927, he bequeathed to the mother of appellee the sum of $10,000.00, to appellee the sum of $10,000.00, and created a trust fund, the income from which was to be paid to May W. Gardiner for life, and after her death, the corpus of said fund to be paid to appellee free of the trust. This will also created a trust fund, the income of which was to be paid to Ethel Barrett Gardiner during the term of her life, and at her death the rest and residue of his property to appellee absolutely free of any trust.

In the will of March 26, 1928, after making certain bequests, he bequeathed to appellee the sum of $5,000.00, the principal sum of $50,000.00 trust fund after the death of one May W. Gardiner, to whom the income of such fund was to be paid so long as she might live, and to Rose Goertner, the mother of appellee, the sum of $5,000.00 and also the residue of his estate, during her life, then the principal sum to be paid to Francis Goertner. Francis Goertner was named as one of the trustees of said trust fund.

In the will dated December 27th, 1928, after making certain bequests to various individuals, he bequeathed to appellee the sum of $5,000.00, and named him as co-trustee of his estate, the income from a third of same to be paid to the mother of appellee for life, and, at her death a third of said trust estate to be paid to the appellee.

There is nothing in the transcript to show that anyone other than testator and the appellant was present when testator dictated to appellant the contents of the paper which was reduced to writing by her and turned over to Zaring.

Commodore Thompson testified that about a week before his death Gardiner told him that he had left "Elizabeth sole executor—everything in her hands;" that he had given his estate to his wife. Two other witnesses testified that appellant "had made him the only home he had ever had."

Considerable space has been consumed by both parties to this litigation in criticizing opposing witnesses because of interest in the result or other motive for shading their testimony. Nearly all of the witnesses gave their testimony in the presence of the trial judge, and in passing upon the facts he, no doubt, took into consideration the motive, if any, that each of them had for coloring their testimony. He was in a position to judge the credibility of the witnesses, and it was within his province to find the facts on conflicting evidence. His finding should not be disturbed unless it is clearly erroneous or against the manifest weight of the evidence. Day v. Weadock, 101 Fla. 333, 134 So. 525; Fulton v. Clewiston Limited, 100 Fla. 257, 129 So. 773; Creel v. Abernathy, 102 Fla. 461, 136 So. 229; Jordon v. Jordan, 100 Fla. 1576, 132 So. 466; Farrington v. Harrison, 95 Fla. 769; 116 So. 497; Cramer v. Eichelberger, 96 Fla. 683, 118 So. 737; Shipley-Young Co. v. Young, 97 Fla. 46, 119 So. 522; Weaver-Loughridge Lbr. Co. v. Kirkland, 99 Fla. 426, 131 So. 784; Hancoy Holding Co. v. Lambright, 101 Fla. 128, 133 So. 631; Turnipseed v. Brown, 102 Fla. 542; 136 So. 343 and other Florida cases.

Taking into consideration the age and physical condition of testator, the fact that he was a very sick man at the time of the execution of the will, and the evidence showing the circumstances connected with its preparation and execution, the opportunity and motive on the part of appellant for unduly influencing testator to give her all of his property, the change from former testamentary intentions, the unreasonable and unnatural character of the will, and the evi-

dence tending to show that the new home was to be built because of pressure brought to bear upon testator by appellant, we cannot say that the County Judge misapprehended the legal effect of the evidence as an entirety in ordering and adjudging that the will of November 1, 1929, was not the last will and testament of Francis Gardiner and that the probate of said instrument be revoked, nor can we say that the appellant has sustained the burden of showing that the Circuit Judge erred in affirming the finding and order of the said County Judge. The decree appealed from is affirmed.

It is also ordered, adjudged and decreed that the temporary injunction heretofore granted herein by this Court be and the same is hereby dissolved.

PER CURIAM.—The record in this case having been considered by the Court, and the foregoing opinion prepared under Chapter 14553, Acts of 1929, Ex. Sess., adopted by the Court as its opinion, it is considered and ordered by the Court that the decree of the lower court be and the same is hereby affirmed.

WHITFIELD, ELLIS, TERRELL and DAVIS, J. J., concur.

BUFORD, C. J., and BROWN, J., dissent.

## ON RE-HEARING.

PER CURIAM.—This case is before the Court for adjudication on a re-hearing which was granted after an earlier opinion of this Court affirming the decree appealed from was filed herein on July 18, 1932.

The case was brought here on appeal from the Circuit Court of Dade County from a judgment affirming an order and judgment of the County Judge's Court of said county, which found and adjudged that an instrument admitted to probate as the last will and testament of one Francis Gardiner deceased, was not in fact the last will and testament of

the said Francis Gardiner, in consideration of which the probate thereof was ordered revoked.

In our former opinion prepared for this Court by Mr. Commissioner DAVIS, we affirmed the decree on the theory that while there was no legal basis in the evidence for the County Judge's order revoking the probate of the will on the ground of lack of testamentary capacity in the testator, Francis E. Gardiner, that nevertheless the decree appealed from could be supported by what the record showed as to alleged undue influence claimed to have been exerted against the testator.

But neither of the Courts below—the County Judge's Court nor the Circuit Court, indicated what the particular ground was upon which the decision revoking the probate of the will was grounded. We are not entirely satisfied that the same conclusion that was reached in the Courts below would have been reached by either the County Judge, or by the Circuit Court, had consideration by them of the case on its merits been confined solely to the question of alleged undue influence alone. For this reason we now rescind and withdraw so much of our previous opinion as relates to the question of alleged undue influence, remitting the determination of that question back to the Court of original jurisdiction, there to be re-examined, retried and reconsidered as a proposition standing by itself, without regard to anything this Court may have heretofore approved in adopting the opinion prepared by Mr. Commissioner DAVIS.

It is doubtless within the competency of this Court on an appeal in a case like this, to make an original examination of the facts, and from the record brought here on appeal, deduce the conclusion as to whether or not the judgment or decree appealed from should be affirmed as a correct result, however that decree was arrived at by the court below.

But we are constrained to think that the better course to

pursue, particularly in a case like the present where two distinct grounds (one undoubtedly insufficient to sustain the judgment) are involved, with nothing in the record to show which one it was that influenced the judgment or upon which one the courts below based their decisions, is to set aside the judgment and decree appealed from, and remand the cause to the court of original jurisdiction for further trial and hearing, where this controversy can be re-heard and reconsidered in the light of the law of this case as declared by the final appellate court, with special reference to the elimination of all grounds upon which the appellate court has held that no challenge of the will can be supported. See Chicago, Milwaukee & St. P. R. Co. v. Tompkins, 176 U. S. 167, 44 L. Ed. 417, 20 Sup. Ct. Rep. 336.

Now therefore, upon re-hearing, the decree appealed from is set aside, and the cause remanded to the court of original jurisdiction, with leave to that court to permit a re-opening of the pleadings, and with leave to grant the privilege of taking further testimony if necessary, and thereafter to enter such new decree and judgment herein as will be according to law and the evidence and not inconsistent with the conclusions stated in our original opinion filed in this cause, as now modified and limited by this opinion on re-hearing. See Kurz v. Pappas, 107 Fla. 861, 146 Sou. Rep. 100. (On re-hearing, 104).

The constitutional writ of injunction heretofore granted herein will stand dissolved upon the filing of the mandate of this Court in the Circuit Court.

Original judgment of affirmance vacated on re-hearing and cause remanded for further proceedings in court of original jurisdiction.

DAVIS, C. J., WHITFIELD, ELLIS and BROWN, J. J., concur.

BUFORD, J., concurs specially.

TERRELL, J., dissents.

Buford, J., concurring specially.—I think the decrees appealed from should be reversed because as I view the record there was neither a lack of testamentary capacity on the part of the testator nor was there proof of undue influence exercised upon him in causing the execution of the will which was attacked.

Aside from what is said in the majority opinion this day filed, the decree should be reversed for another reason. One who claimed to be the wife of Francis Gardiner was allowed to testify over the objection of the contestees concerning transactions and communications between the witness and the deceased. The witness was an interested party to this litigation because if this will here under consideration is held invalid she becomes the beneficiary under a former will. Therefore, all of her testimony concerning transactions and communications between herself and the deceased was illegal and prohibited under the provisions of 2705 R. G. S., 4372 C. G. L.

As is shown by the original opinion and judgment of this Court, as expressed in the original opinion by a majority of this Court, was based largely upon that illegal evidence and upon other evidence which had no basis in the record except as it came into the record in the way of expert testimony given in answer to hypothetical questions which hypothetical questions were in turn based upon the evidence which had been given by this witness.

This illegal evidence so permeates the record that it is quite likely that it had some influence in producing what I conceive to be the opposite result to that which has been reflected in the decrees heretofore entered by the lower courts and by this Court.

ON APPELLANT'S PETITION FOR RE-HEARING OR MODIFICATION OF OPINION IN CERTAIN PARTICULARS AND FOR OTHER RELIEF.

PER CURIAM.—This is a will contest which this Court has decided is under the law, a proceeding *in rem*. Barry v. Walker, 103 Fla. 533, 137 Sou. Rep. 711. Whatever may have been said in our previous opinions, in this cause, directly or inferentially, discussing either the fact or the validity of any of the alleged marriages of the testator, Francis E. Gardiner, is not to be construed as being an adjudication of the fact *vel non,* or of the validity or invalidity of such marriages, or either of them, should that question be hereafter put directly in issue in a controversy between the interested parties, and therein required to be decided on its merits.

We see no occasion, however, for re-opening for further consideration on the re-trial of this case, any proposition except the proposition of the validity of the disputed will as affected by the issue of alleged undue influence concerning which the cause was on re-hearing to be referred back for reconsideration and re-trial on that issue alone.

Neither do we see wherein we would be authorized at this time to make an order dealing with the future administration of the assets of the estate, that being a question which should be determined in the court of first instance before we undertake to decide it.

The opinion of June 5, 1933, heretofore filed, as supplemented and clarified by what is said in this opinion, is adhered to, and the mandate of this Court ordered to issue in accordance with our judgment of June 5, 1933, rendered herein on re-hearing. The motion of appellant for an order dealing with the future administration of the assets of the

estate is denied, without prejudice to the appellant's right to seek such relief in the court below.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.