## IN RE: The Estate of ARRAH BELLE SHOULTS, Deceased

Case No. 83-399-CP-02-HDH

## IN RE: The Estate of W. S. SHOULTS, SR., Deceased

Case No. 83-20 (Consolidated)

Twentieth Judicial Circuit, Collier County

July 26, 1984

### APPEARANCES OF COUNSEL

Gregory G. Olsen and Mark Olsen, Morgan, Olsen & Olsen, for petitioner.

Lawrence A. Farese, Cummings & Lockwood, and Robert M. Bulfin, Law Offices of Carl Turner, for respondents.

### OPINION OF THE COURT

HUGH D. HAYES, Circuit Judge.

This is a Probate case in which the Court has determined that Wills were obtained through the use of undue influence. This is likewise a case that demonstrates the ultimately disastrous effects which result from the imperfect combination of vast financial resources, great avarice, and limited use of moral and intellectual capabilities.

## FINDINGS OF FACT

Walker S. Shoults, Sr. (hereinafter referred to as "SR.") and Arrah Belle Shoults (hereinafter referred to as "BELLE") moved to the Hendry County, Florida, area in approximately 1950, along with their son, Walker S. Shoults, Jr. (hereinafter referred to as "JR."), and began what at that time was a rather small cattle ranching/farming business. At about this same time, JR. married Ellen J. Lancaster (hereinafter referred to as "JOYCE"), and the four (4) members of the Shoults family labored together on the family ranch and whatever income was derived from their labor was reinvested into the ranch. JR. was paid a salary of approximately Forty-seven Dollars ($47.00) per week, and the evidence reflected that each and every member of the then existing Shoults family believed that their common work efforts and endeavors were for the benefit of all for one and one for all, and that upon the death of each of the members of the family, the remaining members of the family would inherit a proportionate share of the ranch.

The record also reflects that SR. and BELLE were very possessive individuals and their attitude toward expenditures and the necessity for thrift could easily be described as one of those persons who could easily "rub the buffalo off a nickel".

JR. and JOYCE had four (4) children, to-wit: Walker S. Shoults III (hereinafter referred as to "III"), John Shoults, Sally Shoults, and Ruth Ellen Shoults. Initially, all of these individuals lived either with each other or immediately adjacent to each other, and they all worked for the common benefit of the ranch. However, it did not take long to become apparent that there was a certain partiality or favoritism shown by SR. and BELLE for III as compared to the other grandchildren. The evidence clearly reflected that III desired many of the luxuries and niceties that were available in life but which were only capable of being provided by SR. and BELLE instead of his own natural parents. To that end, the record reflects that III willingly and voluntarily allowed himself to become the object of SR.'s affections and, in return, extracted many more concessions in the way of material goods and benefits than any other immediate member of the Shoults family was able to enjoy.

**157**

In approximately 1973 to 1974, when III was approximately 22 to 23 years old, a critical and tragic event in the course of the family's lives occurred. III at this time was able to use his influence over the grandparents to effectuate the ultimate removal of his own father, JR., from the active business affairs of the ranch. It appears from the record that III's threat to go on his own, or to go to college, created the fear of loss of possession or affiliation with the grandparents, which culminated in their not only giving III two (2) sections of land, but, in essence, the ultimate and absolute control over the farm. It appeared that since JR. had given just about all of the productive working years of his life toward the acquisition of greater assets for the ranch, and yet, never having been given, to his knowledge, any acreage from the farm, that a great injustice had been done. The resulting effect upon JR. was a total and complete mental breakdown.

The evidence reflects that from approximately 1974 on, III hardly ever came around to see the other members of his family and, in fact, became a totally different person. Ironically, unbeknownst to most of the participants involved herein, SR. and BELLE executed on approximately the 22nd day of November, 1975, Wills in which they directed that upon the death of the survivor of both of them, their estates would be basically distributed in an amount of eighty percent (80%) to their only son, JR., and ten percent (10%) to their grandson, III, and ten percent (10%) to their only other grandson, JOHN. They left nothing to either one of their granddaughters. Later, in December, 1976, a Codicil was signed which gave III one section of land off the top of the estate. It appears clear that even though III was still the "apple of the eye" of SR. and BELLE, they were not forgetting the 24-plus years that JR. and his wife had devoted to the ranch, which was essentially their effective work life, and it appears that that is the reason why JR. still remained the primary beneficiary of their estates after the 1976 Codicil.

In May or June of 1979, Realtor Carl Johnson, a resident of Pompano Beach, Florida, an individual who had previously had some real estate business with SR., and, who eventually became a Co-Personal Representative of the Shoults estate, received correspondence from SR. to come and talk to him about some business affairs. Upon arriving in Immokalee, Florida, the then current residence for the Shoultses, Mr. Johnson was essentially advised by III that his grandparents wanted to establish a Will and III explained why all of the other family members were going to be excluded from the Will. It was from this point forward that evidence would reflect III did most of the talking for his grandparents, gave most of the directions as to what

158

they desired or wanted, and when the grandparents were asked questions, their response would be to the effect that III knew what they wanted and what was best for them.

The evidence clearly reflected that from this point on an attorney, Mr. Carl Turner of Fort Lauderdale, Florida, was retained in order to draft appropriate Wills for SR. and BELLE. The evidence also showed that at this point in time, the decedents were in their middle to upper 80's and were not in the best of health. III, in essence, became the manager of the affairs of the decedents; he hired all of the help, not only for the ranch, but for the personal needs of the grandparents; he basically directed these employees to keep him advised of the goings and comings of the grandparents and any of their visitors; he consciously and openly attempted to dissuade and also prohibit the grandparents from having any contact or relations with the other members of their natural family; he consistently reiterated to the grandparents that he was the only one who cared for the grandparents, the only one who could take care of them, and that none of the other members of the family liked or cared for them at all.

The testimony reflected that in approximately July of 1979, BELLE contacted Attorney Charlie Edwards of Fort Myers, Florida, asking him to represent her because III and his attorney were putting undue pressure on her to convey some land to III, and for her to go along with the building of a new and much larger house. There was more than ample testimony to reflect that neither SR. nor BELLE wanted to move from the quarters they had been inhabiting, which were quite meager, and which, in fact, no one would ever guess that the inhabitants of these small houses owned approximately 13 sections of land and over One Million Dollars' worth of cattle. However, the evidence clearly reflected that III, who witnesses more than once described as being an ardent fan of the TV serial *"Dallas"*, was, just like his hero "J.R.", able to exert his will and influence over the grandparents to build a One Hundred Fifty to One Hundred Seventy-five Thousand Dollars ($150,000-$175,000.00) house on 90 acres of land in Alva, Florida, which action was totally inconsistent with the prior activities of the grandparents. The evidence clearly reflected that III would cuss, yell, demand, and shout at the grandparents until he was able to obtain what he wanted, and, in essence, dominated every move of the old people, including the threat of potentially putting SR. into a nursing home. In the latter days of December, 1979, and the first few days of January, 1980, the evidence reflects that III was able to convince or persuade SR. to lease all of his sections of land to an adjoining cattleman, and at the same time, the cattleman's attorney was very

**159**

helpful in preparing an employment contract between III and his grandfather in which, ironically, the annual compensation just happened to equal one-half of the lease payments. By this time, the evidence had clearly begun to reflect that III treated all of his grandparents' personal and real property essentially as if it was already his own, and had begun spending the assets of the grandparents as if they belonged to him personally and individually.

Essentially, the key date for this undue influence case arose on February 20, 1980, when both of the Wills currently before the Court were signed by SR. and BELLE at the Lee Memorial Hospital in Fort Myers, Florida. Because the Court unequivocally has found that undue influence was utilized by III over his grandparents, the March 25, 1980, Codicil of BELLE's Will is likewise found to be invalid and as an aside, the evidence clearly and unequivocally reflected that as of March 25, 1980, BELLE Shoults was totally incompetent and incapable of understanding or signing any document of any nature. BELLE Shoults died on May 1, 1980.

Prior to the Will signings of February 20, 1980, the evidence reflected that there were several meetings between Attorney Turner, III, BELLE, SR., and, at different times, the appropriate housekeepers, such as Mae Titus, or Claudia Hall. The testimony of the disinterested persons, Titus and Hall, clearly demonstrated that III was adamant about not providing any bequest to the other members of his family, and that in opposition to this, Attorney Turner prophesied that unless III gave the other members of the family something, that a Probate suit would inevitably follow. The final document as prepared by Attorney Turner clearly reflects a lawyer's concern and apparent ability to prevail over III to specifically identify each and every member of the immediately surviving family, and to provide some pittance to each member, in order to avoid the inevitable. Ironically, the record reflects that the tremendous greed of III prevented him from allowing the grandparents to make more reasonable dispositions of their property, and which might have been able to allow him greater protection in this type of suit.

Up until the date of SR.'s death on February 10, 1983, the testimony clearly reflected absolute and total control over the mind and person of SR. Nevertheless, the key date with which the Court was concerned was February 20, 1980, and there was no doubt in the Court's mind that undue influence was exercised at that time and prior to that date, so that the Wills could not be upheld.

### EXERCISE OF UNDUE INFLUENCE

Even though the bellwether case for this area of the law appears to

160

be *In re: Estate of Carpenter*, 253 So.2d 697 (Fla. 1971), one of the more interesting and older cases in this area, which is somewhat analogous to the case before us today, is the case of *Gardiner v. Goertner*, 149 So. 186 (Fla. 1932), in which the Court observed at Page 190 that:

"Undue influence is not usually exercised openly in the presence of others, so that it may be directly proved, hence it may be proved by indirect evidence of facts and circumstances from which it may be inferred."

The Florida Supreme Court went on to point out that physical and mental conditions of the testator, as well as his susceptibility to influence, his age, the circumstances attending the execution of the Will, are all subjects of consideration for the Probate Judge, and they are important in determining whether undue influence has been exerted or not. Likewise, it is generally accepted that it is even proper for the Probate Judge to consider the interest or motive on the part of a beneficiary to unduly influence a testator, and facts and surroundings giving them an opportunity to exercise such influence. The Court in *Gardiner* went on to state on Page 190 that:

"If, however, his mind was impaired, though not to the extent of making him mentally incapable of making a will, and his physical condition was such that he did not have such strength of will enough to resist the influence brought to bear upon him, solicitations in connection with other circumstances may be sufficient to destroy the free agency of the testator and control the disposition of his property under the will, and thereby destroy the validity of the will. . ."

The evidence showed that the testator and the testatrix were physically sick and infirm in body as well as in mind, and that they executed their Wills while in that condition and under the complete control of III. As in the case of *In re: Krieger's Estate*, 88 So.2d 497 (Fla. 1956), the proponent, III, had temporarily moved into the home of the testator and testatrix, had directed their household affairs; he insisted on being present when anyone talked to the elderly couple; he installed a bugging device on their telephone so that he could hear everything that was being said outside of his presence, and as he said to one of the witnesses, it was intended so that he could stay one step ahead of the game. III insisted that he was the business manager for the old people and he did take care of their business. It was as if there was a deja vu when the Florida Supreme Court on Page 498 of the *Krieger* case stated, about Mrs. Krieger, and which could easily have been said about Walter S. Shoults III:

**161**

"He then embarked on a course of cursing, abusing, calling her vile names, dominating her every movement and isolated her from friends; he told her what to eat and how much; when to stand and when to sit; how to dress and what clothes to purchase and directed all of her activities. He was the type that appeared to gloat over the fact that he could handle her so thoroughly. Every element of undue influence was established. Mrs. Krieger's physical and mental condition suscepted her to undue influence and she was shown to be completely dominated by appellant. . . Since no other person was present, the opportunity to impose his will on her was present. It is definitely shown that appellant was disposed to exercise influence over the testatrix. The result of such influence was shown in the will that was produced."

The above-referenced quotation is almost "on all fours", with the case before the Court today.

The circumstances of this case reflect that the decedents made a substantial and material change in the content of those Wills established in 1975 and 1976 when compared to those Wills of 1980. The case law seems to reflect that such an entire change from former testamentary intention is a strong circumstance to support a claim of undue influence. As far back as 1919, the Florida Supreme Court has established that:

"Here it changed the disposition of property that was fair, and prompted by the dictates of affection and regard for those having claims on the testator's bounty, to one where these were flagrantly violated, and it disregarded the moral obligation resting upon him to carry out his promises, so often made, to provide for his child after death. We do not mean to say that a will should be disturbed merely because it is unreasonable and unjust, but where, as in the instant case, it does violence to the natural instincts of the heart, to the dictates of fatherly affection, to natural justice, to solemn promises, to moral duty, such unexplained inequality and unreasonableness is entitled to great influence in considering the question of testamentary capacity and undue influence." *Newman v. Smith,* 82 So.2d 236 (Fla. 1918); On Rehearing, May 14, 1919.

The general case law of Florida is that each case involving active procurement must be decided with reference to its particular facts. Obviously, undue influence is rarely susceptible of direct proof, primarily because of the secret nature of the dealings between the beneficiary and the testator, and because of the death of one of the principals to the transaction, to-wit: the testator. The general rule as enunciated by

**162**

the Florida Supreme Court in *Leonetti v. Boone*, 74 So.2d 551 (Fla. 1954), and as reiterated in the case of *In re: Estate of Carpenter*, 253 So.2d 697 (Fla. 1971), is that the burden shifts to the beneficiary only to the extent of coming forward with a reasonable explanation for his or her active role in decedent's affairs and in the preparation of the Will. This is upon the general theory that a properly executed Will should be given effect unless it clearly appears that the free use and exercise of the testator's sound mind in executing his Will was, in fact, prevented by deception, undue influence, or other means. The burden can be satisfied by the beneficiary coming forward with a reasonable explanation for his or her active role in the decedent's affairs, and, when the burden is satisfied, the presumption will vanish from the case. *However*, neither of these conditions was met by the beneficiary in this case:

> " 'Active procurement' and 'confidential relationship' are legal concepts operating within a broad sphere of factual situations. Within this sphere, the trier of fact is vested with discretion to determine whether or not the facts show active procurement and/or a confidential relationship." *Carpenter*, Page 701.

The Court will now reiterate those criteria established in the *Carpenter* case, and most adroitly used by Judge Hersey on Page 608 of the case of *In re: Estate of Lightfoot*, 433 So. 2d 607 (Fla. 4th DCA 1983), and these criteria are those to be used in determining an act of procurement of a Will through undue influence by the beneficiary:

(1) Presence of beneficiary at execution:

The record clearly reflects that III was not only present at the execution of the Wills, but was present during almost every discussion as to the contents of the Will.

(2) Presence of beneficiary on that occasion when testator expressed desire to make a Will:

The evidence reflects that when Carl Johnson came over to see the decedents, III was not only present to explain to Carl Johnson the purpose for the visit, but likewise the contents to be included within the Will.

(3) Recommendation by the beneficiary of an attorney to draw a Will:

Although there are no indications that III recommended Attorney Carl Turner as the attorney to draft the Wills, the record clearly reflects that III was the intermediary primarily used by Mr. Turner to determine the contents of the Will and the dispositions to be made of

**163**

the assets of the estate. Additionally, it clearly reflected that Mr. Turner became the private attorney for additional business transactions for III. Likewise, the evidence seems to reflect that most of the meetings, to-wit: the times, dates, and places, were established by III through correspondence with Attorney Carl Turner.

(4) Knowledge of the contents of the Will by beneficiary prior to its execution:

The evidence clearly reflects that III was not only knowledgeable of the contents of the Will prior to its execution, but, in essence, dictated the terms of the Will in the name of the decedents.

(5) Giving instructions by beneficiary on preparation of Will by attorney:

This was clearly reflected by the evidence and is covered in the preceding four (4) paragraphs.

(6) Safeguarding of Will by beneficiary subsequent to execution:

The evidence was unclear as to whether or not III safeguarded or had a copy of the Will after its execution, but, considering his overall control and dictation of terms contained therein, it would, indeed, be almost insignificant to be concerned with whether or not criteria number (6) was established.

Even though the criteria established in *Carpenter* are not to be considered as exclusive, and may be supplemented by other relevant considerations appearing in each individual case, it appears undisputably that a minimum of five (5) out of six (6) of these criteria were met in the Shoults case, and they have, indeed, qualified as those "warning signals" pointing to active procurement of a Will by a beneficiary.

## SUMMATION

IT IS, THUS, ORDERED AND ADJUDGED by this Court that those Wills dated February 20, 1980, of ARRAH BELLE SHOULTS and W. S. SHOULTS, SR. were procured as a result of undue influence of WALKER SHOULTS III, and also that the March 25, 1980, Codicil to the Will of ARRAH BELLE SHOULTS, was procured by the undue influence of WALKER SHOULTS III. The Court will retain jurisdiction to supervise the succession of control of W. S. SHOULTS, SR.'s estate and ARRAH BELLE SHOULTS' estate, and for all other proper matters resulting therefrom.

In closing, it would appear that this case fairly falls within the quotation made by Justice Terrell of the Florida Supreme Court, when, in 1956, he stated:

"This case is typical of others which have made their way to this court in which one who is senile or otherwise incompetent becomes possessed of a sizable wad, then like the prodigal son, excites the devotion of the avaricious who never before found anything about them to excite their interest. The web of deceit is forthwith thrown about the victim and the surprising thing about the whole affair is that those who cast the net so often exhibit no more alertness in spoiling their designs than the victim of their greed does in avoiding them." *In re: Estate of Krieger*, 88 So. 2d 497 (Fla. 1956).