DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**DEMETRA F. BLINN,**
Appellant,

v.

**PATRICIA A. CARLMAN** and **BRIAN BLINN,**
Appellees.

No. 4D13-1156

[March 18, 2015]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Diana Lewis, Judge; L.T. Case No. 502012CP003699XXXXMB.

Philip M. Burlington and Nichole J. Segal of Burlington & Rockenbach, P.A., West Palm Beach, and Robert C. Sorgini of Sorgini & Sorgini, P.A., Lake Worth, for appellant.

Jane Kreusler-Walsh and Rebecca Mercier Vargas of Kreusler-Walsh, Compiani & Vargas, P.A., West Palm Beach, and Theodore S. Kypreos of Jones, Foster, Johnston & Stubbs, P.A., West Palm Beach, for appellees.

GROSS, J.

The final judgment invalidating the April 2, 2008 will based on undue influence is supported by substantial competent evidence and, thus, we affirm. *Hendershaw v. Estate of Hendershaw,* 763 So. 2d 482, 483 (Fla. 4th DCA 2000) ("The probate court's findings in a will contest shall not be overturned where there is substantial competent evidence to support those findings, unless the probate judge has misapprehended the evidence as a whole.").

"When a will is challenged on the grounds of undue influence, the influence must amount to over persuasion, duress, force, coercion, or artful or fraudulent contrivances to such an extent that there is a destruction of free agency and willpower of the testator." *Levin v. Levin,* 60 So. 3d 1116, 1118 (Fla. 4th DCA 2011) (quoting *Raimi v. Furlong,* 702 So. 2d 1273, 1287 (Fla. 3d DCA 1997)). The doctrine of undue influence is based on the theory that the "testator is induced by various means, to

execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator." *In re Winslow's Estate,* 147 So. 2d 613, 617 (Fla. 2d DCA 1962) (citation omitted). "Undue influence is not usually exercised openly in the presence of others, so that it may be directly proved, hence it may be proved by indirect evidence of facts and circumstances from which it may be inferred." *Gardiner v. Goertner,* 149 So. 186, 190 (Fla. 1932) (citation omitted).

The Florida Supreme Court has established a set of non-exhaustive factors for courts to consider on the issue of undue influence or active procurement:

    (a) presence of the beneficiary at the execution of the will;
    (b) presence of the beneficiary on those occasions when the testator expressed a desire to make a will;
    (c) recommendation by the beneficiary of an attorney to draw the will;
    (d) knowledge of the contents of the will by the beneficiary prior to execution;
    (e) giving of instructions on preparation of the will by the beneficiary to the attorney drawing the will;
    (f) securing of witnesses to the will by the beneficiary; and
    (g) safekeeping of the will by the beneficiary subsequent to execution

*In re Estate of Carpenter,* 253 So. 2d 697, 702 (Fla. 1971).

In August 2007, appellant became the decedent Richard Blinn's fourth wife. Richard was almost 82. His mental health began to deteriorate as early as 2005 and he suffered from "numerous and serious physical infirmities beginning in 2005 and continuing until his death" in 2012. In addition to physical problems, Richard had cognitive difficulties. From 2006 onward, he suffered from progressive dementia, which worsened over time. He frequently engaged in inappropriate behaviors and expressed paranoid beliefs. As the trial judge found, Richard started to make "imprudent financial decisions, which caused his local yacht brokerage business [Sovereign Yachts] to decline significantly." In 2007, he began to regularly play mail-away scam lotteries in foreign countries and was convinced that he was winning significant sums, without ever receiving a dime. In June 2011, a circuit court determined that Richard was totally incapacitated and appointed his daughter, Patty, as his plenary guardian. As the trial court found, the decedent was "susceptible to undue influence due to his declining physical state, anxiety disorders, depression, and

progressive dementia." *See Hack v. Estate of Helling,* 811 So. 2d 822, 826 (Fla. 5th DCA 2002) (stating that a testator's "failed mental capacity . . . is a factor which should be considered, as supporting the undue influence claim."); *In re Perez' Estate,* 206 So. 2d 58, 59 (Fla. 3d DCA 1968) ("It is true . . . that the amount of undue influence need not be great where a testator is weak and his intellect clouded.").

The April 2, 2008 will was executed under most suspicious circumstances. Two lawyers were involved, a referring lawyer and the drafting lawyer. The referring lawyer, who had minimal experience in estate planning, was a social friend of Richard and appellant. In 2007, appellant "loaned" the referring lawyer money, which was never repaid. The referring lawyer sent Richard and appellant to the drafting lawyer, his former law partner, to obtain a new will for each of them. The referring lawyer testified that he did not discuss the contents of the new will with Richard or appellant, nor did he give his former partner instructions for its preparation; he said he gave the couple no legal advice whatsoever.

The testimony of the drafting lawyer sharply conflicted with that of the referring lawyer. The drafting lawyer had no personal interaction with the couple prior to their appearance at his office on April 2, 2008 to sign their new wills. His law firm provided no legal advice to the couple prior to the wills' preparation. He had no knowledge of the decedent's prior wills or his estate plan. He testified that it was the referring lawyer who gave him instructions for the preparation of the decedent's will and the revocation of a power of attorney. He sent a copy of the decedent's will to the referring lawyer along with an e-mail saying that the will had been prepared without talking or giving estate planning advice to Richard and appellant. The drafting lawyer spent minimal time with the couple on April 2, 2008, and he "acknowledged that he was uncomfortable with the circumstances surrounding his preparation of the 2008" will. In his testimony, the drafting lawyer repeatedly stated that he had trouble recalling the meeting, which was "vague" in his memory. The majority of his conversation was with appellant, who did most of the talking. If both lawyers are to be believed, Richard's April 2008 will drafted itself and miraculously appeared at the drafting lawyer's office on April 2.

Although appellant claimed that she first learned of the appointment with the drafting lawyer on the morning of April 2, she could not explain how the drafting lawyer obtained a copy of her earlier will and trust. In May, 2008, appellant sent the drafting lawyer two "doctor letters" stating that both she and her husband were of sound mind. The letters had been written in July, 2007, nine months before the execution of the 2008 wills. Appellant wanted the letters to be attached to both her will and Richard's.

The drafting lawyer did not request these letters and recognized that they would have had little probative value since they had been written so long before the execution of the 2008 wills. This conduct suggests that, on her own, appellant was trying to overcome legitimate concerns about the circumstances surrounding the April, 2008 will.

The 2008 will completely transformed Richard's prior estate plan. In a 2006 will executed eight months after he met appellant, Richard devised the entire estate outright to his daughter, Patty, with his granddaughter as the alternate beneficiary. This will was consistent with an earlier will which provided for Richard's family. Prior to meeting appellant, Richard financially assisted his children. However, the 2008 will devised the entire estate to appellant, with an existing charity created by Richard as the alternate beneficiary. Four months after the execution of the 2008 will, the charity was dissolved and all of its assets were distributed to a New Hampshire beneficiary.

Before and during the marriage, appellant preyed on Richard's paranoia and mental infirmity to alienate the decedent from his two children and their families. Both of his children had enjoyed close, loving relationships with their father prior to his marriage to appellant. Richard and his daughter, Patty, had worked closely together at Sovereign Yachts. Communication with Patty dropped off once appellant took control of the couple's life. None of Richard's family or friends were invited to the August 3, 2007 wedding. Whenever Richard's son, Brian, telephoned, appellant would immediately hang up if she answered the phone. Due to appellant's dislike of Brian's lifestyle, she and Richard did not attend Brian's wedding.

A significant insight into the dynamics of the marital relationship occurred when appellant inadvertently left a message on a cell phone of a former employee of Sovereign Yachts. She had dialed the number and forgot to hang up before she started in on Richard. On the voicemail, appellant was screaming at Richard that,

> Patty was still running the company, that she was – and that she was still running the company, she's lying to him, "She's no GD good, I told you so, I told you she's no GD good, she's just taking your money doing stuff behind your back, she's not telling you about this."

At the beginning of the message appellant said, "[s]ee, Richard, I told you the number is still working. I told you she is stealing from you. She's running the company and not telling you about it." Although appellant claimed that it was Richard's belief that Patty was stealing from him, it is

clear that it was appellant who aggressively pushed this idea, without any evidence of Patty's wrongdoing. It is rare in a case like this to have such a glimpse into an abusive marital relationship.

Prior to the marriage, Patty took care of her father's personal finances and helped him pay his bills. After the 2007 marriage, appellant paid all the bills and wrote all the checks. In the summer of 2008, appellant wrote a letter in her own handwriting to Richard's life insurance company requesting that the beneficiary on his policy be changed from Patty to appellant. Appellant sent a similar handwritten request to the insurance company in 2010 and again in 2011, after Richard was hospitalized and diagnosed with severe dementia. At the time of this hospitalization, appellant contacted the drafting lawyer's law firm to send her estate planning documents for Richard and a durable power of attorney in favor of appellant; she said she would have the documents signed, witnessed, and notarized. The law firm complied with appellant's request. The trial judge found that if appellant were "so bold as to openly display such influence over [the decedent]," then the court could "reasonably infer that similar or greater influence was occurring in the dark during their marriage."

We give deference to the trial judge's detailed final judgment; she heard the evidence, questioned the witnesses, and observed their demeanor. On an evidentiary issue, we find no abuse of discretion in the trial court's consideration of Dr. Alexander's testimony.

*Affirmed.*

TAYLOR and LEVINE, JJ., concur.

\*         \*         \*

***Not final until disposition of timely filed motion for rehearing.***

- 5 -