IN THE MATTER OF THE ESTATE OF CLARA R. STARR, DECEASED, ROWLAND HALE STARR, JOSEPH S. RIEGEL, ABBIE A. KELSO, and BENJAMIN T. BATSCH, as Administrator, Etc., v. BRADLEY C. WILSON, as Executor, Etc., ALLICE K. BRUCE and G. DUNCAN BRUCE.

BRADLEY C. WILSON, as Executor, *et al.*, v. ROWLAND HALE STARR, *et al.*

170 So. 620.
Division A.
Opinion Filed December 26, 1935.
Rehearing Waived November 18, 1936.

*Don Register and Yager, Bebont & Stecher* (Toledo, Ohio), for Contestants;

*Holland & Bevis* and *Satterlee & Canfield* (New York City) for Proponents.

BROWN, J.—Two appeals have been taken to this court involving the validity of the same last will and testament, one being taken from an order and decree of the Circuit Court for Polk County, made by Circuit Judge Taylor, denying the probate of a will made by Clara R. Starr in 1924 on the ground that she did not possess sufficient mental capacity at that time to execute a valid will, and the other appeal being taken from a decree made by Circuit Judge Petteway of the same Circuit, reversing the decree which had been entered by Judge Taylor, and ordering that the will be admitted to probate. ·

On October 11, 1926, Bradley C. Wilson, as Executor, filed a will of Clara R. Starr dated December 24, 1924, and applied for probate thereof in Polk County, Florida. Eleven days thereafter a will of the said Clara Starr, dated February 13, 1911, was filed in Lucas County, Ohio, and the Probate Court of Lucas County, Ohio, took jurisdiction thereof and probated said will. This will was admitted to record in Polk County, Florida, on April 22, 1930, and in June, 1930, an attempt was made to probate the 1924 will in Polk County, Florida, but the order entered on June 6, 1930, for probate of the 1924 will, was void on account of the disqualification of Judge Wiggins. Thus the only will of the said Clara R. Starr that has ever been admitted to probate was the 1911 will. This suit is a contest between the Ohio executor and the heirs of Clara R. Starr's late husband, Rowland Starr, claiming under the will of 1911 admitted to probate in Ohio, and Bradley C. Wilson, Executor of the 1924 will, petitioner for probate, joined by C. Duncan Bruce and wife, beneficiaries.

Upon the disqualification of Judge Wiggins, Hon. Harry G. Taylor, one of the judges of the Circuit Court of Polk County, Florida, took jurisdiction of the entire matter at the request of Judge Wiggins. Rowland Hale Starr and two other heirs of Mrs. Clara Starr's husband, and the Executor under the 1911 will, contested the probate of the 1924 will on the grounds of lack of testamentary capacity, undue influence, and a previous alleged agreement on the part of G. Duncan Bruce and wife which it was claimed recognized the validity of the 1911 will, and estopped them from seeking to probate the 1924 will. The last ground of contest was properly stricken by Judge Taylor on motion of proponents. Schouler on Wills, 6th ed., Sections 730, 743; Redfearn on Wills, etc., in Fla. 142, 143.

After hearing the testimony Judge Taylor entered an order denying the probate of the 1924 will, giving as his reason the lack of testamentary capacity of Clara R. Starr.

The proponents-appellees, being uncertain as to the capacity in which Judge Taylor was functioning, filed two appeals from this decision or order of Judge Taylor's; one was direct to the Supreme Court upon the assumption that the procedure before Judge Taylor and Judge Taylor's decision were in the Circuit Court (which was correct); the other appeal was taken from Judge Taylor's decision to the Circuit Court of Polk County, Florida, on the assumption that Judge Taylor was sitting as a substitute County Judge and that the proceedings before him were in the court of the County Judge. This assumption was probably due to the phraseology used in the court orders. Judge Petteway of the Circuit Court, who expressed some reluctance to review the action of his brother Circuit Judge, after carefully reviewing and analyzing the testimony and applicable authorities, reversed the judgment which had been

rendered by Judge Taylor. Although this appeal to the Circuit Court was mistakenly taken, Judge Petteway's opinion and conclusions on the testimony are in accordance with our own views of the case tried before Judge Taylor.

Section 5199 C. G. L. of 1927 says "The Judge of the Circuit Court, in case of the disqualification, absence, sickness or other disability of a County Judge, is authorized to discharge all the duties appertaining to said Judge in regard to the probate of wills, granting letters testamentary and letters of administration, appointing curators and guardians, and making all necessary orders in regard to the custody, preservation or sale of the estates of deceased persons."

In State v. Horne, 86 Fla. 309, 98 So. 330, this Court speaking through the present Chief Justice, said: "Section 17 of Article V of the Constitution does not give to the County Judge *exclusive* jurisdiction 'of the settlement of the estates of decedents' etc., and Section 11, Article V, gives the Circuit Courts stated elements of jurisdiction and also jurisdiction 'of such other matters as the legislature may provide.' This is ample authority for the quoted statute, and it is not affected by the provision of Section 11 that Circuit Courts shall have 'supervision and appellate jurisdiction of matters arising before county judges pertaining to their probate jurisdiction,'" etc.

Judge Taylor took jurisdiction pursuant to the above quoted section of the Compiled General Laws and was acting in the capacity of Circuit Judge when he took jurisdiction of the cause, instead of as a substitute county judge; therefore the appeal to the Circuit Judge, acted upon by Judge Petteway as Circuit Judge, was unauthorized and conferred no jurisdiction, and the judgment rendered thereon was void and of no effect. Thus, the effective ap-

peal here is the one taken to this Court from Circuit Judge Taylor's decision. See also Schaefer v. Voyle, 88 Fla. 170, 102 So. 7. All these proceedings in the lower Court took place before the adoption of Section 52 of the Probate Act of 1933.

In the 1911 will Clara R. Starr left the bulk of her estate to her husband, Rowland Starr, and his heirs, and to her father, and brother. By 1921, the husband, father and brother were dead, and she made a new will. The new will of 1921, made a few small bequests, such as $2,000.00 each to the pastor of her Church (as Pastor) ; to Boardman, a distant cousin and her only living blood relation; and to Clarence Griffin, a negro chauffeur, and the bulk of her estate was to be divided equally between Dr. Simondson and Mr. G. Duncan Bruce.

Dr. Simondson was the family physician and took care of Mrs. Starr's father who lived with the Starrs. It also appears that Mr. Rowland Starr during his life time needed care and attention, and these people, being quite wealthy, had secured the services of Dr. Simondson of Winter Haven, Florida, for that purpose, and had him residing in their home in Winter Haven, virtually as a member of the family. It also appears from the undisputed facts in the record that said G. Duncan Bruce was a very close personal friend of the family and business associate of Rowland Starr; that Clara R. Starr and her husband, Rowland Starr, were both very fond of Mr. and Mrs. Bruce and their little daughter, the Starrs having no children of their own.

Mrs. Starr had depended greatly upon her husband, especially in business matters, and at the death of her husband in 1911, it appears from the evidence that, though a very intelligent and cultured old lady, she knew practically nothing about the management of business affairs, and con-

sequently she asked Mr. Bruce, an intimate friend of long standing, to attend to her business for her and relieve her of that burden, and she wanted the Doctor to continue on in her home as physician and managing head of the household for the remainder of her life, which necessitated his complete abandonment of public practice during her lifetime. Obviously Dr. Simondson could not enter into such an agreement without adequate provision for compensating him, nor could Mr. Bruce; and so between the three of them, Simondson, Bruce and Mrs. Starr, it was agreed that they would undertake to do what she wanted them to do provided she would make them joint heirs of her estate at her death, and there was no other compensation provided for them. This was a perfectly normal agreement under the circumstances, and a very advantageous one for Mrs. Starr, because it enabled her to enjoy her complete estate during her lifetime without having to reduce her enjoyment of the estate by having to pay physician's or management fees to Dr. Simondson and Mr. Bruce, and since she had only one distant relative and Dr. Simondson and the Bruces were her best friends, she would naturally want them to have a large share of her estate at her death in any event. Mrs. Starr executed a will in accordance with this understanding in 1921. As it was, both parties lived up to their agreement until March, 1926, at which time there seems to have been a falling out between the Doctor and Mrs. Starr and a settlement was negotiated in which he was paid some $27,000, in addition to $15,000 already paid by the gift of an orange grove, in lieu of any rights he might have against the estate of Clara R. Starr under her will, which had meanwhile been rewritten in 1924. It appears that Bruce continued to carry out his part of the agreement until the death of Clara R. Starr.

On the 24th day of December, 1924, Clara R. Starr went to the office of her attorney, Bradley C. Wilson, and executed another will, which will contained substantially the same provisions as the 1921 will, except that it cut the bequest to Dr. Simondson to $10,000 cash, and the residue of the estate, excepting the other legacies, to go to G. Duncan Bruce; and she fixed the compensation of her attorney, as executor, at $5,000, which was not unreasonable in view of what his statutory compensation would have been.

The main questions involved in this cause are whether or not the judge in the court below erred in finding that Clara R. Starr did not have mental capacity to make a will when she executed the 1924 will, and second, whether or not in the event that she did have such mental capacity and the court below was in error in deciding to the contrary, is the disposition of her estate under this will the result of undue influence brought to bear upon the said Clara R. Starr to execute it, so that it was not her own free act and deed?

The trial court necessarily did not deal with the question of undue influence because he decided that Clara R. Starr did not have the mental capacity to execute the will.

To authorize a court to deny or revoke the probate of a will on the ground of undue influence there must be active use of such undue influence for the purpose of securing the exection of the will, to such an extent as to coerce the mind of the testator, so that it cannot be said that the testator was acting voluntarily, of his or her own free will and volition. Confidential relations between the testator in his life time and the legatee who offers the will for probate are not alone sufficient to raise a presumption of undue influence and cast the burden of proof upon the proponent in that regard. Bancroft v. Otis, 91 Ala. 279, 8 So. 286.

In the case of Newman v. Smith, 82 So. 236, 77 Fla. 633, 667, 668, this court stated: "Undue influence comprehends over persuasion, coercion or force that destroys or hampers the free agency and will power of the testator. Mere affection or attachment, or a desire to gratify the wishes of one beloved, respected, and trusted, may not, of itself, amount to undue influence affecting the testamentary capacity of a testator."

In Peacock v. DuBois, 105 So. 321, 90 Fla. 162: "To constitute undue influence the mind must be so controlled or affected by persuasion or pressure, artful or fraudulent contrivances, or by the insidious influences of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but subject to the will or purpose of another."

"The rule seems to be well settled that undue influence, justifying the setting aside of will, deed, or other contract, must be such as to dethrone the free agency of the person making it and rendering his act the product of the will of another instead of his own." Id.

One of the first things to consider is the naturalness or reasonableness of the provisions of the will. Here was a rather helpless, but very intelligent old lady, naturally retiring, having led a sheltered life, with little or no business ability or experience. Her devoted husband upon whom she had leaned for years had but very recently departed this life. She had no relatives save a distant cousin in whom she was not interested and who had no claim upon her. Her husband's relatives had been amply and well provided for by her husband in his will. She was very fond of the Bruces and Dr. Simondson, and, besides, the Doctor stayed on as a member of the household and took all of the responsibililties from her shoulders so far as

bothering with the household and the making of traveling arrangements were concerned, and also cared for her as a physician and friend. Also realizing that she did not have business experience and had a large estate, she wanted a capable man whom she could trust to take over the complete handling of the estate and look after her property. She especially told Mr. Wilson, the attorney, to put in the will these reasons as her reasons for thus disposing of her property.

We agree with the opinion of Judge Petteway that there is no sign of undue influence or anything unnatural in this will. No beneficiary was present when she made it. She flatly refused to cut the negro chauffeur's $2000 bequest to $1000, as urged by her counsel, showing that she knew who she wanted to favor and just how much she wanted them to have. She could be easily persuaded to do things that made no material difference to her, but she had a mind of her own as to matters that she was interested in or deemed of importance, and even in small matters that affected her personally. Thus no one could persuade her to leave off her mourning apparel nor could her nurses persuade her to change the type of her undergarments. She had definite ideas on what she really wanted and obtained them. A number of her letters, which were introduced in evidence, show this. They also show that she was a lady of more than ordinary refinement and education.

Bradley Wilson, the attorney who drew the will in question, testified that Mrs. Clara Starr came to his office by appointment, made the day before, accompanied only by her nurse, and gave him the details contained in the will herself, unaided. The nurse took no part in the conversation. We can not conceive that a reputable, ethical, and truthful, as well as competent attorney which, as stated by

Judge Taylor in his written opinion, Mr. Wilson was, would be a party to the execution of a will under such circumstances that it would be executed under or through undue influence. The only difference between the 1921 will and the 1924 will is the change in the bequests to Dr. Simondson and Mr. Bruce. If the 1921 will had been induced by undue influence it would be stretching inferences too far to say that it carried over for the three years elapsing between the two wills.

Joe Riegel, one of the contestants, a nephew of Mrs. Starr's deceased husband, was staying at the Starr residence, as was Dr. Simondson, whose bequest was lowered, at the time that the change was made in 1924, and they would have had far greater opportunity to exercise undue influence on Mrs. Starr than did Mr. Bruce, who, while a frequent visitor, did not live in the Starr home. There is no evidence that Mr. Bruce suggested or had anything whatever to do with the making of this new will, or anyone else, for that matter.

It is probable that the valuable services, kindness and consideration of Bruce and the Doctor had a great deal to do with Mrs. Starr's selection of her chief beneficiaries, but the fact that a will was induced through kindness and flattery and caring for a person is no evidence of undue influence. White v. Starr, 47 N. J. Eq. 244, 20 Atl. 875; Den v. Gibbons, 22 N. J. Law 117; Eddy's Casem, 32 N. J. Eq. 701; Collins v. Osborn, 34 N. J. Eq. 511; Brick v. Brick, 43 N. J. Eq. 167, 10 Atl. Rep. 869; on appeal, 44 N. J. Eq. 282, 18 Atl. Rep. 58; Wheeler v. Whipple, 44 N. J. Eq. 141, 14 Atl. Rep. 275; on appeal, 45 N. J. Eq. 367, 19 Atl. Rep. 621; Elskinton v. Brick, 44 N. J. Eq. 154, 15 Atl. Rep. 391. In re Humphrey's Will, 26 N. J. Eq. 513, *sub nomine* Henkins, v Moore, 27 N. J. Eq. 567.

It is the policy of the law to hold wills good wherever it can be done. This, according to the authorities, is particularly true of old people. They are no doubt, generally speaking, reasonably easily influenced and are generally childish and forgetful and possibly from the layman's viewpoint, not qualified to make a will. But the only weapon these old people have to enforce consideration and good treatment of themselves, and proper care, is the power to dispose of their estates by will.

It has been said that old people, generally speaking, usually fall into two classes; those that become critical and disagreeable or contrary and stubborn, and those who seem to mellow with age and are very considerate and agreeable. The testatrix very happily falls in the latter class and was very agreeable, but she had a mind of her own and knew what she wanted.

Taking into consideration the policy of the law, we are forced to the conclusion that there is not a sufficient showing in the record of this case to support the allegation of contestants that there was undue influence practiced on the testatrix.

This brings us to what is perhaps the really contested question in this cause and the point on which the court below based its order deciding that the 1924 will of Clara R. Starr was not a valid will.

After diligently searching the record, carefully reading the testimony and exhibits, and giving due weight to the decision of the learned trial judge who actually heard the testimony, we fail to find sufficient evidence to sustain the holding of the court below that, at the time the will was made, Mrs. Starr was without sufficient mental capacity to make a will.

The question is, did she have legally sufficient mental

capacity *at the time she made the will?* It is in this respect that we think the trial judge misapprehended the legal effect of the evidence.

. In regard to the state of the testatrix's mind at the time of making the will in question, we will comment briefly upon the voluminous testimony of some of the more important witnesses. The testimony comprises some three hundred and fifty pages of the record.

A Dr. Clarke, of Toledo, formerly physician of Mr. Rowland Starr, later physician of one of the contestants, testified for the contestants. The memory of this witness, as Judge Petteway observed in his opinion, seems about as bad as that of the deceased. While he had known Mrs. Starr for years, his testimony relates mainly to a short stay with Mrs. Starr in Toledo, Ohio, in 1921, and a short visit he made with Mr. Starr at Winter Haven in 1921, then a short period in June and August of 1922, ending August 9, 1922, nearly two and a half years before the will in question was executed in December, 1924. He did not see her again until May 11, 1926, one and a half years after the execution of the said will and just prior to the time of her death and at the time that she was apparently under the influence of her nurse-companion, Mrs. Kopp. The Doctor tries to show that she was the same throughout those intervening years; that she was suffering from Senile Dementia; that her memory was gone; that she was unable to take care of herself; but when pinned down to facts the Doctor's testimony was sadly lacking in any concrete facts to sustain his opinion. He seemed anxious to pronounce her mentally abnormal, or at least feeble minded. Her letters alone refute this. Mrs. Clark's testimony corroborated that of her husband to some extent, especially as to Mrs. Starr's memory being bad, and that she was more or less helpless.

Miss Madden, former nurse-companion of Mrs. Starr, who was with her in 1920-22, testified that they played bridge but that Mrs. Starr's memory was bad and that Mrs. Starr couldn't remember what she had done the day before. She did testify, however, that Mrs. Starr remembered who to send Christmas gifts to, and who was entitled to them.

Mrs. Louise McCormick Boling, nurse-companion 1922 -23, testified that Mrs. Starr did not have the mind of a child, but that she was mentally deficient and unable to look after herself, and that she could not remember things.

Miss Van Duyne, nurse-companion, April-September of 1923. She testified that Mrs. Starr's mental condition was not clear, and that her mind was not alert, but in contradiction to the other nurse's testimony she states that Mrs. Starr did recognize neighbors and friends. She also testified that Mrs. Starr did many of the things that the other nurses said that she could not do.

There is considerale conflict in the testimony of the three nurses as to what Mrs. Starr did and did not do and could and could not do, viz.: that she could not manage her household affairs; that she could not carry on a conversation; that she could not dress herself; that she had no memory of her own; that she could not play bridge; that she could not write letters; but when pinned down to facts these opinions in each case are based on the fact that Mrs. Starr did not do some of these things for herself, and yet these witnesses testify that they were not hired only as nurse-companions, but to run the household as a daughter would. Other testimony shows that she did play bridge, though not very well, that she conversed with intelligence; and there are letters in the record, written by Mrs. Starr herself, which show that this testatrix not only knew what she

wanted, but how to get it, and that she did not want to be bothered with the very things that she did not do, and that some of the nurses thought that she could not do.

Mrs. Starr wrote to Dr. Simondson fully before Miss Boling was hired; that she was going to get another nurse and that she was going to let the one she had go, but that the one she had did not know it yet and that she would not let her know until she came back off her trip; that after her return she would give her plenty of time or notice before letting her go, so as to be fair with her. This shows not only shrewdness and intelligence, but a disposition to take care of herself and at the same time to be fair to another. Her letter stated that Miss McCormick, the prospective nurse, was not only to be nurse, but was to manage the household affairs. She apparently did not want to be bothered with such things and wished to have plenty of time to herself. Dr. Simondson testified that Mrs. Starr was rather indolent, or what one might call, plain "lazy."

, Two other witnesses for contestants, neighbors, Mrs. Plaisted and Mrs. Caffee, testified. The .testimony of Mrs. Plaisted, such as it is, is about like that of some of the other witnesses for contestants; her memory seems to have been rather bad about the matter; but it apparently must have covered a period of time just after the death of Mrs., Starr in 1921 and she does not appear to have had occasion to have closely observed Mrs. Starr anywhere near the period of the execution of the will.

· Mrs. Caffee, who seems to have been the wife of a former family physician of the Starrs, in her testimony touches somewhat on the period during which the will was executed, but she herself says she did not see Mrs. Starr very often in 1924-25 or 26, "probably not more than three or four times in that period." Later on, she says she thinks she

saw her as much as two or three times a year. She gave as her *opinion* that Mrs. Starr was mentally impaired before Mr. Starr's death and worse thereafter. The sum and substance of her factual testimony was that Mrs. Starr had a bad memory.

Mrs. Perrin, a beneficiary under the 1911 will and a contestant in this case, testified to a period in 1921, shortly after the death of Mr. Starr and three years prior to the 1924 will. Her testimony is about the usual routine of other witnesses for contestants, but does not cover a period anywhere near the time of the execution of the will.

A Mrs. Jones, testifying for the contestants, testified that she called on Mrs. Starr in 1924 or 1925 asking for money for the church and that Mrs. Starr did not say much. We can sum the testimony of this witness up in her own expression: "She did not seem to pay much attention to what we were saying; *that was the only thing I noticed about her."* Mrs. Starr did not contribute. This does not show lack of mental capacity. It might show selfishness, indolence, but not lack of mental capacity to understand what she owned and what she wanted to do with it.

Witness Leslie B. Anderson, testifying for contestants, was one of the few witnesses who had occasion to observe Mrs. Starr from time to time, about the time that the will was made in 1924, seeing her at the bank where she apparently carried on her banking business, and according to our understanding of what the mental condition of an old person had to be to render her incompetent to make a will, the testimony of Mr. Anderson, testifying for the contestants, established the mind of Mrs. Starr to have been such as to have legally entitled her to make a will, though it is true that Mr. Anderson testified that Mrs. Starr was an old lady and her memory was poor; that it was hard for her

to remember her transactions and what she would do with any particular property or money unless she had assistance in doing so, and that Mr. Bruce was apparently her financial advisor; that she had an account at the bank; that she signed her own checks and that she probably asked him from time to time regarding one or two matters, securities, etc. He further testified that she and her assistant may have often asked about a check and for information of a dividend to be collected, or with reference to certain papers or securities and for Mr. Anderson's advice in the handling of same, and that when he was in conversation with her, her conversation was intelligent and that he noticed nothing abnormal at all about her and that "she talked with you just as an intelligent and reasonable person would" and that she talked "just like any childish old lady and talked to me about her affairs as a son." Mr. Anderson stated that she was a nice old lady with no business training, and that she was just like anyone else would be, situated as she was. He considered her in her right mind. This testimony does not show that she was legally mentally incompetent to make a will, but rather it establishes her competency to make a will.

Another witness for the contestants who had an opportunity to observe her at the time of making the will was Joseph S. Riegel, a nephew of Mr. Starr and one of the contestants. He was visiting Mrs. Starr at her home in Winter Haven at the time she made the will in question. He testified that he was very charmingly treated; that Mrs. Starr knew him and that he drove her frequently. There is nothing whatever to indicate any sufficient lack of mental capacity on the part of Mrs. Starr to make a will and he never questioned her right to make a will, although he knew she made it. He stated that he played cards with his

aunt who played a very poor hand and had to be considerably coached and helped, but that she enjoyed it; that he conversed with her; that the best way to divert her mind was by simple little things like the birds and things around the grounds and house and that seeing such little things while driving would give her pleasure; that he talked with her about many things that required the use of her memory; that she remembered things in her life quite well; that it was the things that happened about the time that she lost her father and husband that were difficult for her to remember.

The only conclusion one could reach from his testimony is that his Aunt Clara had a poor memory, especially for recent events, which is nothing unusual with elderly people, and that Mrs. Kopp and Doctor Simondson managed the household.

Mr. Wilson's testimony is unquestioned, and is corroborated by the subscribing witnesses, to the effect that Mrs. Starr came to his office, accompanied by her nurse, of her own free will and volition so far as he knew, and clearly explained to him just what disposition she wanted to make of her property and she herself gave him all the details contained in the will. Mrs. Starr especially asked him to state in the will that because she had given Dr. Simondson a $15,000 grove and numerous gifts and trips that she wanted his bequest cut to $10,000, and the residue to go to Mr. Bruce, and that the reason that she was leaving it to these two men was because she did not have any near relatives; that the only relative she had was a distant cousin to whom she wanted to leave $2000. She stated that the Starr heirs, contestants, were well provided for in Mr. Starr's will. That Bruce had been her dearest friend and that if anyone was entitled to the estate it was "Duncan." Mr. Wilson and

Mrs. Starr came to an agreement as to his salary or compensation as executor. It further appears that he could not make her change the $2000 bequest to the colored chauffeur.

· Mr. Wilson testified that Mrs. Starr was in every way mentally capable of making her will and the subscribing witnesses corroborated his testimony.

Judge Taylor's comment on Mr. Wilson's testimony in his written opinion was as follows:

"And having carefully considered the testimony of Mr. Bradley C. Wilson, who ·prepared the said Last Will and Testament, as to the circumstances of its preparation, and his acquaintance with and observation of said Clara R. Starr; and knowing said Bradley C. Wilson to be of unquestioned integrity and highly ethical in his practice, the Court accepts such testimony as the honest and conscientious opinion of said attorney as to the testamentary capacity of said testatrix, fully believing in his good faith and truthfulness; but in view of all the testimony and evidence, the Court believes said attorney to have been deceived as to the testamentary capacity of said testatrix, it appearing from such testimony that his acquaintance with and observation of her was very limited."

It will be noted that Jurge Taylor did not question the accuracy of Mr. Wilson's testimony as to the facts, but merely his opinion of Mrs. Starr's mental capacity based on those facts. Now, as we see it, if the facts testified to by Mr. Wilson be true, his testimony as to Mrs. Starr's mental condition and testamentary capacity is bound to be true. His recital of what took place in her conference with him, and the reasons she gave for making the will which she did make at the time, shows that, when she made the will, she knew perfectly well what she was doing, and had

good reasons for doing it. The only conclusion that we can reach is that at that time, at least, Mrs. Starr was a sane, well-balanced and reasonable person, and that her testamentary capacity was well proven.

Mr. Starr, in his will, made Mrs. Starr one of the trustees of the large estate and trust fund he created by his will, and she signed papers, etc., pertaining to the trusteeship during the time in question.

The nurses testified that she paid cash for her groceries and that they helped to see that she received the proper change. They were at least inaccurate in this respect, for, according to the testimony of her grocer and his clerk, she never paid cash for her groceries. The books of the groceryman, Runkle, covering a part of the period, corroborated his testimony. The nurses further testified that they controlled the shopping, whereas the groceryman and his clerks testified that Mrs. Starr selected the items other than the list of staples sent by the cook and that she was very close with her money and would never buy at the first of the season such things as strawberries and the like, but would wait until the price came down. Contestant's witnesses testify that she carried her own money and that she never misplaced her purse; that she had business conferences with Mr. Bruce, too. All this testimony shows that in things that she was interested in she was very capable or mentally normal and that is what we have to consider. Several of those with whom she had ordinary business dealings state that she was a kindly admirable old lady, perfectly normal mentally. The Attorney who drew the will and the attesting witnesses testify that she was perfectly normal and the Doctor that was constantly with her and took care of her (Dr. Simondson) states absolutely that she was

in normal condition mentally. And the will itself is a natural disposition of the property under the circumstances.

Dr. Simondson states absolutely that she was clothed with a sound mind; that she enjoyed very good health except for a mild case of diabetes controllable by diet; that she would converse intelligently; that she knew her mind; that she was absolutely rational and competent to discuss anything which interested her. Who better would know her condition than the doctor who waited upon her constantly during the time in question and thereafter?

Dr. Crump, a Winter Haven physician and a member of the State Board of Medical Examiners, who saw her frequently when she was occupying her winter home, testified that she was normal mentally.

Miss Simondson, a sister of Dr. Simondson, went abroad with Mrs. Starr in 1923 and states that she was mentally fit.

G. V. Juhlet, one-time American Vice-Consul to Copenhagen, Denmark, testified that he had dinner with her about once a week in the summer of 1923; that they played bridge, and that she was absolutely attentive and a gracious hostess and was perfectly normal mentally.

She traveled extensively nearly every year during the five years that she lived after her husband's death—to South America, to Europe, to Alaska, also to California, accompanied by Dr. Simondson and a nurse or lady companion, and made trips between Ohio and Florida during the time in question; visited and was visited; attended dinners and gave dinners; which shows that she had a normal taste, and the dinners and visits show that her company was enjoyed by others.

In Fernstrom, *et al.,* v. Taylor, 107 Fla. 490, 145 So. 208, this court said: "The general sanity, mental alertness, shrewdness, capacity and business ability of the testatrix

over the period for many years leading up to the making of her will was testified to by almost a score of witnesses, including her personal *attorney, doctors, bankers,* servants, etc. No better line of testimony could have been found on which to predicate sanity.

In the case of Kerr v. Lunsford, 2 L. R. A. 668, the West Virginia Court held that the physician attending the testator is entitled to great weight; also the evidence of witnesses who were present at the execution of the will is entitled to peculiar weight. The case of McCracken v. McCracken, *et al.,* 219 Pac. 196, follows in line, and Mr. Chief Justice Lord in Clark v. Ellis, 9 Or. 128, states: "The point of time, then, to be considered at which the capacity ·of the testator is to be tested, is the time when the will was executed. This is the important epoch." Judge Washington says: "The evidence of the attesting witnesses, and next to them, of those who were present at the execution, all other things being equal, are most to be relied upon." In the instant case two doctors testified that she was sane and normal, one of the doctors was her regular physician and companion. Her attorney and the attesting witnesses all say that she was perfectly normal. Her banker also said that, though somewhat childish and doty, she was normal for a woman of her age.

In Gardiner v. Goertner, 110 Fla. 377, 149 So. 186; Hamilton, *et al.,* v. Morgan, 93 Fla. 311, 112 So. 80, and Hooper v. Stokes, 107 Fla. 607, 145 So. 855, this court makes clear that the capacity of the testator *at the time of the execution* of the will is the question involved. In Gardiner v. Goertner, above cited, it was said: "A sound mind, as applied to the executon of a will, comprehends ability of the testator to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's re-

lation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed."

In Taylor v. Kelly, 31 Ala. 59, 68 Am. Dec. 150: "That the testator should make a valid will, it was not necessary that her memory should be perfect, and her mind unimpaired. If she had memory and mind enough to recollect the property she was about to bequeath, and the persons to whom she wished to will it, and the manner in which she wished it to be disposed of, and to know and understand the business she was engaged in, she had, in contemplation of law, a sound mind; and her great age, bodily infirmity, and impaired mind would not vitiate a will made by one possessing such capacity." Citing Harrison v. Rowan, 3 Wash. 385; 1 Jarman on Wills 50; Coleman v. Robertson, 17 Ala. 84, and other authorities.

In the case of White v. Starr, *et al.,* 47 N. J. Eq. 244, 20 Atl. 875, witnesses testified to many eccentricities and lapses of memory on the part of the testator, making a much stronger case than the contestants here have produced, but the New Jersey Court found that he was mentally capable of making a will.

In this case, the provisions of the will itself, considered in connection with the statements made by Mrs. Starr to the attorney at the time, and the recitals therein, all of which the attorney tells us were *her own statements, provisions and suggestions,* are wholly inconsistent with lack of sufficient mentality to make a legal will. They show she knew she had no near relatives; that she wished she had; that she knew of her husband's relatives (the contestants), but felt he had amply provided for them; that the two chief beneficiaries were her best friends and looked after her, and she wanted them to have her estate; that whereas orig-

inally they were to share equally, she had done so much for Dr. Simondson she thought he should be satisfied with $10,000, and leave the remainder to Bruce; and that she wanted a definite understanding of the Executor's total costs and suggested the limitation to $5000, instead of leaving it uncertain under the statute, evidently figuring that the 6% charge might run it into many thousands more than $5000, showing incidently that she had a fair idea of the general nature of her estate. She remembered her negro chauffeur with $2000, and her church with a like sum; she remembered her distant cousin, her only blood relation, with $2000, and she must have had in mind as to Dr. Simondson that, as he was to live with her the rest of her life, she would have to spend large sums caring for him and taking him with her over the world in her travels. These facts show that she realized sufficiently the amount of her estate, because she left the various $2000 bequests and the $10,000 bequest and still understood that this left by far the bulk of her estate to go to Bruce. Clearly, the testimony of the will itself and the attorney who drew it and the subscribing witnesses who corroborated his testimony, show that Clara R. Starr knew in a general way the nature and extent of her estate, and comprehended the relations existing between her and those who would naturally expect to benefit under the will, and selected the objects of her bounty with full understanding of her reasons for so doing, and fully realized the practical effect of the will she was making. That is all the mentality required.

In 28 R. C. L. 94-95, it is said:

"Mere old age, physical weakness and infirmity or disease or even extreme distress and debility of the body, are not necessarily inconsistent with testamentary capacity, but such facts are admissible in evidence to aid the jury in de-

termining whether or not the testator had sufficient testamentary capacity at the time of making his will. The circumstance that a testator, at the time of executing his will, is suffering from acute pain or is on his death bed does not take away his testamentary capacity. A person who is blind may make a will, as may one who is deaf and dumb. Where a testator's sickness is wholly physical, proof of his condition as to lethargy, suffering, or unconsciousness on days preceding or following the execution of the will is entitled to very little consideration. The powers of the mind may be weakened and impaired by old age and bodily disease without destroying testamentary capacity, and mere mental weakness, not due to mental disease but solely to physical infirmity, does not constitute mental unsoundness, and the courts will scrutinize efforts by witnesses to infer mental weakness or insanity from mere physical decrepitude. It has been said, however, that weakness of intellect, sufficient to negative such capacity, may be traceable to old age, diseases and bodily infirmities. To an aged person as well as to one in the prime of life the usual tests as to testamentary capacity will be applied, as, for example, whether the testator knows the amount of his property and the natural objects of his bounty and understands what he is doing. The law prescribes no limit in point of age beyond which a person cannot dispose of his property by will. On the contrary it has been justly said that the will of an aged person should be regarded with great tenderness, when it appears not to have been procured by fraudulent means, but contains those very dispositions which the circumstances of his situation and the course of the natural affections dictated."

And in Redfearn on Wills and Administration in Florida, Section 40, it is said:

"Eccentric habits and absurd beliefs do not establish testamentary incapacity. A person may be addicted to the strongest peculiarities or he may be frantic in his appearance or behavior and yet possess testamentary capacity. Old age, of itself, does not deprive a person of testamentary capacity. Regardless of how old a person may become, he still retains his power to make a will, so long as his mind is sufficiently sound for him to know and understand at the time his will is executed what disposition he is making of the property."

From all the testimony, in the language of Judge Petteway's opinion, it seems to us that "here was an old lady somewhat childish, considerably forgetful, very reticent, who merely wanted to retire into a shell and not even be burdened with talking to others unless it was something especially interesting to her, but with plenty of knowledge of people and things in which she was interested; who did not always answer questions, but could do so intelligently. She made a will and a natural disposition of her property under the circumstances; that she was mentally competent to make the will at the time it was made, which is the all decisive point of time, and that, while she was of a type and age that might have made her somewhat easily susceptible to the practice of undue influence, there is no such practice shown here, and hence that the will executed by her on December 24th, 1924, should have been held to be valid and her last will and testament and probated accordingly."

The decree rendered by Judge Petteway being void for want of jurisdiction is reversed. See Wheeler v. Ridge County Holding Co., 98 Fla. 999, 124 So. 457.

The order of the lower court entered by Judge Taylor, holding that the will executed by Clara R. Starr is not a valid will, is hereby reversed with directions to enter an

order adjudicating said will to have been validly and legally executed and to be the last will and testament of Clara R. Starr, deceased, and admitting same to probate.

Decree reversed.

WHITFIELD, C. J., and DAVIS, J., concur.

TERRELL and BUFORD, J. J., concur in the opinion and judgment.