109 So.2d 375 (1959)
In re ESTATE of Laura M. BRACKETT, deceased.
A.G. WAKEFIELD, Appellant,
v.
Mary Lenora BRACKETT and Sarah A. Cornell, Appellees.
No. 535.
District Court of Appeal of Florida. Second District.
January 9, 1959.
Rehearing Denied February 9, 1959.
McMullen, Rives and Baskin, H.H. Baskin, Jr., Clearwater, Hayden C. Covington, Brooklyn, N.Y., for appellant.
*376 William M. Goza, Jr., Clearwater, for appellees.
ALLEN, Acting Chief Judge.
This is an appeal from an order of the county judge holding the Last Will of Laura M. Brackett invalid for lack of testamentary capacity. The appeal is by A.G. Wakefield, named as Executor in said Will.
The beneficiaries under a prior will, Mary Lenora Brackett, the decedent's sister-in-law, and Sarah A. Corneil, the decedent's sister, contested decedent's Last Will on the grounds of incompetency and undue influence. After hearing extensive testimony, the county judge entered an order in which he held that the testatrix lacked testamentary capacity.
The attack on the decree of the lower court is primarily one questioning the sufficiency of the evidence and the court's application of the law to such evidence. The record on appeal contains over 435 pages of testimony and the evidence is sharply conflicting.
The testatrix, a childless widow, died December 29, 1956, at the age of eighty-one. Surviving her were a sister and a nephew; and also a sister-in-law. She had, prior to her death, lived in Clearwater, Florida, for about twenty years. Her husband had resided with her until his death in 1948. After her husband's death, she resided alone in her home.
On June 7, 1949, testatrix executed a Will in which she left her estate to her sister and her sister-in-law, share and share alike. Thereafter, the testatrix, in September, 1955, was baptized by the appellant, Wakefield, in the church generally known as Jehovah's Witnesses, the corporate name of which is the Watchtower Bible and Tract Society.
In February, 1956, the appellant contacted attorney Baskin for the purpose of having him draw a Will leaving all of the testatrix' property to the Watchtower Bible and Tract Society. Previously, all of testatrix' legal work had been handled by attorney Goza. Attorney Baskin had the testatrix examined by two physicians, one of whom reported that she was incapable of making a Will and the other that she was capable. The Will in question was executed June 4, 1956.
In June, 1956, incompetency proceedings were instituted to determine the mental condition of testatrix. Thereafter, on a hearing conducted before the county judge, the testatrix was declared incompetent. Testatrix died on December 29, 1956, the cause of death being given on the death certificate as "cerebral vascular accident due to arterioschrotic cardiovascular-renal cerebral disease (the underlying cause being) qualified arterioslerosis and senility." Thereafter, on January 4, 1957, the appellant offered the Will for probate. The appellees contested on the grounds above mentioned, and the order appealed from resulted.
The very able county judge, now a circuit judge, in his order holding the Will ineffective for lack of testamentary capacity, said:
"Laura M. Brackett's husband died December 11th, 1948 and on June 7th, 1949 she executed a will leaving her estate to her sister, being her sole heir presumptive, and to her deceased husband's sister. Thereafter she gradually declined in health and became forgetful and erratic as a result of generalized arteriosclerosis, a progressive ailment commonly known as hardening of the arteries. On July 18th, 1956, pursuant to proceedings in this Court held July 3rd-7th, she was adjudged incompetent by reason of chronic senility. Her sister was appointed guardian of her person and The First National Bank of Clearwater was appointed guardian of her property. Following her death on December 29th, 1956 the same institution was appointed *377 curator pending the conclusion of this contest litigation and the further order of the Court.
"The will here in issue, dated June 4th, 1956, was executed shortly before Laura M. Brackett was adjudged incompetent, and by its terms she completely departed from a long declared testamentary intent. Her acquaintance with the proponent A.G. Wakefield had been relatively brief and was related to their mutual affiliation with Jehovah's Witnesses. She had been baptized by A.G. Wakefield in September, 1955, previous to which time their association had been casual and confined mainly to an occasional meeting at religious services. At her home on or about February 9th, 1956 she indicated, according to A.G. Wakefield, a desire to will her estate to Jehovah's Witnesses. Thereafter, according to his own and other testimony, his visitations and attendance upon Laura M. Brackett became frequent and constant.
"It was A.G. Wakefield who directly supplied the data for the preparation of the will and it was prepared by an attorney who was unknown to Laura M. Brackett and who now represents A.G. Wakefield as the proponent in these proceedings. Laura M. Brackett previously had been represented regularly by the attorney who prepared her will of June 7th, 1949, but the attorney preparing the new will was not informed of that fact. It should be noted in connection with the new will that the attorney proceeded cautiously and ethically, insisting that Laura M. Brackett first undergo a doctor's examination. Attended once by the attorney's secretary and at another time by A.G. Wakefield, Laura M. Brackett was interviewed and observed separately by two doctors whose reports conflicted. The will thereupon was signed, following reference and assent to its contents, and was witnessed by the drafting attorney and two secretaries in his office.
"During the period prior to June 4th, 1956 Laura M. Brackett's sclerotic condition became more pronounced and marked changes in her appearance, speech and demeanor were observed by visiting friends and acquaintances who had known her for a considerable number of years. For example, she began to speak of her deceased husband as alive and physically present. She imagined that an airplane had dropped certain insects found around her home on Clearwater Beach. She would forget, remember and again forget the promised gift of a personal article to the son of one of her friends whom she greatly admired. On occasion she did not recognize the attorney who prepared her will of June 7th, 1949 and who had constantly represented her although the attorney was then present and conversing with her. After she was injured in a fall and was hospitalized on July 14th, 1956, she referred to the same attorney as her attorney. During the same period she referred to the disposition of her estate according to her will of June 7th, 1949 as though it were still her will, indicating that she had forgotten the will here in question.
"Plausible contrary inferences may be drawn from the testimony of a number of witnesses who testified forthrightly according to honest convictions, but the evidence as a whole convincingly sustains the contestants' objections based on the alleged incapacity of Laura M. Brackett to make a valid will on June 4th, 1956. Inasmuch as the Court so finds, inquiry into undue influence is unnecessary. Although the incidents of the association between Laura M. Brackett and A.G. Wakefield are indicative of influence which might or might not be undue in a legal sense, these incidents *378 are more indicative of the extreme senile condition of Laura M. Brackett. Mental illness in itself does not, of course, necessarily denote testamentary incapacity; but the entire factual picture of this case impels the conclusion that Laura M. Brackett could not form and retain a plan of disposition of her estate and, moreover, could not publish any such plan in the form of a will without active guidance and direction such as the evidence abundantly discloses on the part of A.G. Wakefield.
"A holding of invalidity due to incapacity would seem also to be the most charitable basis for the decision of this case. It is assumed that the proponent A.G. Wakefield, representing a zealous and sincere religious society, is a kindly man who did not realize that he was promoting the execution of a will by a person incapable of making a valid will. His good intentions may be fairly postulated but, assuming Laura M. Brackett to have been competent, it is conceivable that his well intended acts could have amounted in law to undue influence. This decision, however, does not so hold."
The appellant argues that the lower court misconstrued the weight of the evidence. "Weight of the evidence" has been held to be equivalent to "preponderance of the evidence." It simply means that proof on one side of a cause outweighs the proof on the other side.
As was stated in the case of Waldron v. New York Cent. Ry. Co., 1922, 106 Ohio St. 371, 140 N.E. 161, 163, as follows:
"The terms `weight of evidence' and `sufficient evidence' have long been regarded as synonymous terms and used interchangeably."
"Weight of evidence" does not necessarily mean a greater number of witnesses, since quality of testimony and credibility must also be considered. Bjorklund v. Continental Casualty Co., 1931, 161 Wash. 340, 297 P. 155, 160.
"Weight of evidence" is not a question of mathematics but depends on its effect in inducing belief. Chenery v. Russell, 1933, 132 Me. 130, 167 A. 857, 858.
The expression "weight of evidence" signifies that the proof on one side is greater than on the other, and in any proceedings before a trial judge, probative value of the testimony of each witness, and not the quantity or amount of evidence, determines its weight.
The weight of the evidence is determined by the lower court, and on an appeal, an appellate court does not weigh the evidence for that is the primary function of the nisi prius judge.
In the late case of In re Zimmerman's Estate, Fla. 1956, 84 So.2d 560, 561, the Court said:
"The probate judge heard all of the witnesses, except those who testified by deposition, and, as we have observed in similar cases, he was in a much better position than we are to evaluate the effect of their testimony, and fit into the complex puzzle that confronted him the various pieces that went to make up the entire picture. Many of the witnesses he apparently knew personally or by reputation; he had an opportunity to view their reactions and the directness or apparent lack of sincerity of particular witnesses in giving their replies to questions. Through his direct contact with the case he was in a position to carry in his own mind the continuity of events as they unfolded before him on the witness stand. In fact, this record in our judgment clearly justifies the application of the rule which we have consistently followed that we will not interfere with the findings of fact or the conclusions of law reached by the probate judge on the basis of *379 such factual findings unless there is an absence of substantial competent evidence to support the findings or the trial court misapprehends the legal effect of the evidence as a whole.
* * * * * *
"A study of the pertinent cases reveals that the precise condition of the testator's mental health at the time he executed his will may be established in more ways than one. It may be established by direct proof as to its condition when the will was executed or it may be established by inferences from proof of his mental condition leading up to and following the execution of the will when such proof is properly related and connected. The evidence shows that the testator was afflicted with arteriosclerosis, a progressive disease of the arteries which seriously affects and may ultimately dethrone the reason, judgment and power of the victim to bear in mind the status of his property or those who would be the natural subjects of his bounty. The evidence here shows that sometime in 1947 or 1948 the testator was in a serious condition as a result of this affliction. What the condition of his mental health was when he executed his will and codicil in 1949 was the immediate problem confronting the probate court. `Before hand' and `afterward' proof of the testator's mental behavior would certainly be a lead to this and would be proper for the court to consider in making up his judgment as to whether or not the will was made during a lucid interval as appellants contend or whether it was made when the mind was incompetent to do so.
"* * * There is in fact so much in the record that supports the finding of the probate court that to reverse him would amount to nothing more than substituting our judgment for his on a matter exclusively within his province which we are not authorized to do. Gardiner v. Goertner, 110 Fla. 377, 149 So. 186; In re Starr's Estate, 125 Fla. 536, 170 So. 620; In re Wilmott's Estate, Fla. 1953, 66 So.2d 465, [40 A.L.R.2d 1399]; Hooper v. Stokes, 107 Fla. 607, 145 So. 855, 146 So. 668."
We have considered other points raised in the appellant's brief but find no ground for reversal of the lower court.
We are convinced from a study of the record in this case that the trial judge had sufficient evidence before him upon which to base his conclusions. We therefore affirm the lower court.
Affirmed.
SHANNON, J., and SMITH, FRANK A., Associate Judge, concur.